**LEASE**

Between

**THE SOUTH LOOP SHOPS, L.L.C.,**
**as Landlord**

and

**Hitz Restaurant Group, LLC dba Giglios State Street Tavern.**

Property:

**825 S. State Street**
**the Building known as**
**"The South Loop Shops"**
**Chicago, Illinois 60605**

TABLE OF CONTENTS

SECTION                                                                                  PAGE

**Section I. Demised Premises, Parking, Term**.............................. .. ...................
    **1.1 Demised Premises**.................................... .......... ..... ... . ....... ...................... ... ... 1
        (A)    Location...............................................................1
        (B)    Real Estate...........................................................2
    **1.2 Term** ........................................... . ...............;... .... ...................... 2
    **1.3 Rent Commencement Date**.................................. .... .      3
    **1.4 Possession Date** ......................... ... ..........................     3
    **1.5 Intentionally Omitted** ...........................................................3
    **1.6 Option to Extend**.......................... . ................................. ... ...........3
        (A)    Option .....................................................     3
        (B)    Condition to Exercise Potion.... . ....................     3

**Section II. Rent**.... ............................................ . ............ . .....................     4
    2.1.    **Minimum Rent** ................................................     4
    2.2.    **Percentage Rent** ....................................     4
               **- Intentionally Omitted** ...................................4
    2.3.    **Additional Rent**.................................................     4
        (A)    **Amount**. ...........................................     4
        (B)    **Intentionally Omitted**
        (C)    **Intentionally Omitted** .......................     4
        (D)    **Definitions of Additional Rent**.............................     4
    2.4.    **Payments** .......................................     8
        (A)    **Manner of Payments** .......................................     8
        (B)    **Late Payments** .......................................     8

**Section III.** Construction of Building................ .... ...... ............................ ... ...9
    3.1.    **Landlord's Work**.................................................................     9
    3.2.    **Tenant's Work** ....................................... ..... ...........     9
        (A)    **Tenant's Work**..... ...... ......................... .... ... ...........     10
        (B)    **Tenants Plans** .......................................     10
        (C)    **FF&E** .......................................     11
    3.3.    **Tenant's Entry Prior to Possession Date**....................... .... ........ ... ...     11
    3.4.    **Tenant's Contractors** ....................................... ..     11
    3.5.    **Changes to Building** ....................................... ..     12
    3.6.    **Zoning**.......................................     12
    3.7.    **City Requirements**....................................... ..... ............. . .......... . ......     12

Section IV. Insurance ............................................................................... ,.13
    4.1.    **Tenant's Insurance** ............................................................. 13
    4.2.    **Form of Policy** .................................................................. 14
    4.3.    **Failure to Carry** ............................................................... 14
    4.4.    **Landlord's Insurance** ..... 14
    4.5.    **Priority of Insurance. Waiver** ........................................ 14

**Section V. Repairs and Maintenance** ................................................. **15**
    5.1.    **Tenant's Obligations** ....................................................... 15
    5.2.    **Landlord's Obligations** .................................................... 15

**Section VI. Alterations** ........................................................................ **16**
    6.1.    **Alterations** ......................................................................... 16
    6.2.    **Procedures** .... ... .. ................................................................ 16
    6.2.1 Location of Dumpster . ... . ............................................... 17
    6.3.    **Performance** ...................................................................... 17
    6.4.    **Removal by Tenant** ........................................................... .17
    6.5.    **Liens** .................................................................................... 17
    6.6.    **Survival** .............................................................................. 18

Section VII, Utilities ................................................................... ... ...18

Section VIII. Governmental Regulations ........................ ... ................. 18

**Section IX. Damage to Demised Premises** .......................... ..... ........ 19
    9.1.    **Destruction of Premises** ........................ .. ..................... 19
    9.2.    **Tenant's Right to Terminate** .................... .. ......... ... ....... 20

**Section X. Eminent Domain** ................................................................. 20
    10.1.    **Total Condemnation** ........................................................ 20
    10.2.    **Partial Condemnation** ...................................................... 21
    10.3.    **Award** ................................................................................ 22

**Section XI. Assignment and Subletting** .... ...................................... **22**
    11.1.    **Assignment and Subletting** ............................................ 22
    11.2.    **Landlord's Right to Recapture** ........................................ 23
    11.3.    **Tenant to Remain Obligated** ........................................ ....24
    11.4.    **Assignee to Assnme Obligations** .................................... 24
    11.5.    **gent** .................................................................................... 24
    11.6.    **Excess Rent** ....................................................................... 24
    11.7.    **Change of Control** ........................................................... 24
    11.8.    **Event of Default** ..... .... ...................................................... 24
    11.9.    **Transfers** ............................................................................ 25

Section XII. Use and Operation of the Building ............................. ...................25
    12.1.    Permitted Use ........................................ .. . ... ........................25
    12.2.    Prohibited Uses ...................................................................25

12.3.   Operation of Business ................ ..... ...... . ................................. 25
12.4.   Food Service Operation. ......................... ... .. ... ......................... .. ... ............. .... . 26

Section XIII. Signs............... ... ............... .. ........... . ............... ............ 27

Section XIV. Defaults and Remedies............... .............. ..... .. ............ ... ..27
14.1.   Events of Default .......... ! ............ ... ................................. . ............... 27
14.2.   Landlord's Remedies ............ .. ...................................................... ...... ,,,.28
14.3.   Remedies Cumulative ........................... .... ................ .. ... 28
14.4.   Landlord's Defaults and Tenant's Remedies................. :..................... 28

Section XV. Covenant of Title and Quiet Enjoyment ....................................... 30

Section XVI. Subordination ............ ... ............ .. ................ .. ................. 30
16.1.   Subordination ............................................;.... ... ................ 30
16.2.   Attornment.................................................... 30
16.3.   Advance Rent: Security Deposit....................................... 30
16.4.   Notice and Right to Cure.......................................... 31
16.5.   Non-Disturbance Agreement........................................ 31
16.6.   Definitions .......................................................... 31

Section XVII. Indemnification............................................. 31
17.1.   Tenant's Indemnity.......................................... 31
17.2.   Landlord's Indemnity........................................ 31
17.3.   Survival.......................................................... 32

Section XVIII. Surrender; Security Agreement...... ..... ... ... .. .. ... ..................... 32
18.1.   Surrender..... ...................................................... 32
18.2.   Holding Over........................................................ 32
18.3.   Intentionally Omitted................................................ 32
18.4.   Access........................................................ 33
18.5.   Waiver Of Trial By Jury............. . ................................ 33
18.6.   Intentionally Omitted................................................ ,,..33
18.7.   Dollars.......................................................... 33

Section XIX. Brokers Representation ...................................................... 33

Section XX. Estoppel Certificates ...................................................... 33

Section XXI. Rules and Regulations........ .. .......................... ... ................. 33
Section XXII. Security Deposit and Construction Equity.Lirie ............. .... ................................ 348

Section XXIII. Limitation of Liability                                    34

Section XXIV. No Option; Irrevocable Offer                                35

Section XXV. Rent Not Based on Income ............................................................................ 35

Section XXVI. Unrelated Business Income ......................................................................... 35

Section XXVII. ERISA .......................................................................................................... 35

Section XXVIII. Rights Reserved to Landlord .................................................................... 35

Section XXIX. Miscellaneous ............................................................................................... 36
    29.1.   Entire Agreement; Waiver ......................................................... i ................ 36
    29.2.   Time of the Essence ................................................................................... 36
    29.3.   Notices ........... .. .......................................................................... .36
    29.4.   Construction of Lease; Severability ......................................................... 37
    29.5.   Force Majeure ............................................................................................. 37
    29.6.   Hazardous Materials .................................................................................. 38
    29.7.   Tenant's Representation and Warranty .................................................... 40
    29.8.   Patriot Act .................................................................................................. 40
    29.9    Validated Parking ...................................................................................... 40
    29.10   Valet Services ............................................................................................ 41
    29.11   Outdoor Seating Area ................. .. .......................................................... 41

## **EXHIBITS**

Exhibit A        Drawings Showing Location of Demised Premises, Building and Common Areas

Exhibit B        Minimum Rent, Manner of Payment of Minimum Rent
Exhibit C        Intentionally Omitted

Exhibit D        Intentionally Omitted
Exhibit D-l      Intentionally Omitted
Exhibit E        Intentionally Omitted
Exhibit F        Intentionally Omitted
Exhibit G        Rules and Regulations
Exhibit H        Signage Criteria
Exhibit I        Prohibited Uses
Exhibit J        Exclusive Uses Granted to Other Tenants Form of Tenant Estoppel Certificate
Exhibit K        Tenant Estoppel Certificate
Exhibit L        Landlord FF&E
Exhibit M        Personal Guaranty

## LEASE

THIS LEASE (this "Lease") is made and entered into as of this 26th day of February, 20 19 ("Date of Execution") by land between THE SOUTH LOOP SHOPS, L.L.C., an Illinois limited liability company ("Landlord"), having its principal office at c/o SouthBlock Development and Management, 700 n. Green Street, Suite 504, Chicago, Illinois 60642 and HITZ Restaurant Group, LLC, dba Giglios State Street Tavern with offices at 108 W. Schick Rd, Unit 384 Bloomingdale ,IL 60108 an Illinois Corporation, (herein collectively as "Tenant").

### WITNESSETH:

That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant covenant, promise and agree as follows:

### Section I

### Demised Premises, Parking. Term

**1.1 Demised Premises.**

　　　　(A) **Location.** Landlord hereby demises unto Tenant, and Tenant rents from Landlord, all those certain premises as outlined in <u>Exhibit A</u> (collectively, the "Demised Premises") consisting of approximately 3,621 Rentable Square Feet (defined below) on the ground floor, at 825 S. State Street in the commercial building located at State Street and 8th Street in Chicago; Illinois 60605. The exact number of square feet of the Demised Premises and its exterior wall dimensions are depicted in Exhibit A. The rights granted to Tenant hereunder include the non-exclusive use of the Common Areas (as hereinafter defined) servicing the building and parking on the east side of the building, and other improvements which are now, or may hereafter be, located or servicing the building which is presently known as the "South Loop Shops" (collectively, the "Building") which, with the residential building, common areas servicing the residential units, a portion of a parking garage servicing the residential portions of the Project (as hereinafter defined), a portion of a parking garage servicing the Building, some common areas which are shared by the Building and the residential portions of the Project and, in particular, those portions of the Project, if the same shall then exist, the common corridors, stairwell, elevators (excluding elevators servicing the residential units in the Project), pedestrian sidewalks; loading docks, delivery areas and service areas; landscaped areas and related control structures and facilities; and all other areas, equipment or improvements provided by Landlord for the convenience and use in common by Landlord, Tenant, other tenants, occupants and users of the Building and others permitted or required to use such areas, for residential use and use of the Building ("Shared Common Areas"), all of which are vertically adjacent to and are collectively referred to as the "Project". The portions of the Project may be under separate ownership. "Rentable Square Feet" of the Building shall mean the number of square feet of floor space on all floors of the Demised Premises and the Building, including mezzanines, measured from the center line of party walls between tenant areas and the exterior face of other walls, without deduction for columns, stairs, shafts or other interior projections. "Rentable Square Feet of the Demised Premises" shall mean the number of square feet of floor space on all floors of the Demised Premises as measured above (3,621 Sq FT)

. The exterior walls and roof of the Demised Premises and the area beneath the Demised Premises as well as the area above the finished ceiling level of the Demised Premises are not demised hereunder, and the use thereof together with the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires, heating, ventilating, cooling, plumbing, electrical and other systems as well as structural elements leading through or a part of the Demised Premises in locations that will not materially interfere with Tenant's use thereof are hereby reserved *unto* Landlord.

  **(B)    Real Estate**. The land (the "Real Estate[1]") upon which the Project and/or Building is located as shown in Exhibit A. "Common Areas" shall mean those portions of the Building: if the same shall then exist, the common corridors, stairwell, elevators, pedestrian sidewalks; loading docks, delivery areas and service areas; landscaped areas and related control structures and facilities; and all other areas, equipment or improvements provided by Landlord for. the convenience and use in common by Landlord, Tenant, other tenants, occupants and users of the Building and others permitted or required to use such areas, other than for strictly residential use. Tenant, its agents, employees and invitees, shall have a non-exclusive license and right to use the Common Areas and Shared Common Areas in accordance with the terms of this Lease and the Rules and Regulations (defined below).

**1.2 Original Term** The Original Term of the Lease shall be ten (10) years with one (1) five (5) year Options to Extend as provided in Section 1.5 hereof. The term "Lease Year" means each period of twelve (12) consecutive calendar months commencing as follows: (I) the first Lease Year will begin either on the Rent Commencement Date if the Rent Commencement Date falls on the first day of a month, or on the first day of the next succeeding month, if the Rent Commencement Date falls on a date other than the first day of a month; and (II) each successive Lease Year will commence on the anniversary of the beginning of the first Lease Year.

**1.3 Rent Commencement Date** The obligation to pay Rent and other sums due under this Lease shall begin as shown in Exhibit B of Lease. Rent Commencement shall be October 1, 2019.

**1.4 Possession Date.** Tenant shall be granted possession of the Demised Premises upon the Date of Execution of this Lease and providing all insurance certificates required in section IV of this lease. Tenant accepts the Demised Premises in an AS-IS, WHERE-IS condition subject to HVAC will be operational, electric connection to circuit breaker panel, plus hot water tank, Cold water and waste are functioning to present fixtures. Inspection to be made prior to start of any construction.

**1.5 Intentionally Omitted**

**1.6 Option to Extend.**

  **(A)    Option.** Subject to the terms of this Section 1.5. Tenant shall have one (2) options to extend; the term of this Lease for an additional period of five (5) Lease Years each ("Option Period"V to begin upon the expiration of the Lease Term or of this Lease as extended on the same terms and conditions set forth herein, except that (i) Option Periods, once exercised cannot be exercised again,, (ii) no Rent

concessions, abatements, lease buyouts, tenant allowances or limitations on tax or expense pass-through granted with respect to the Lease Term hereof shall be applicable to any Option Period, and (iii) Base Rent shall start at $45.66 and increase by 3% annually.

**(B)** **Conditions to Exercise of Option.** In order to exercise its option to extend, the following conditions must be satisfied: (i) Tenant shall provide Landlord with written notice of its irrevocable election to extend not less than six (6) months, nor more than twelve (12) months, prior to the expiration of the Lease Term (as the same may have previously been extended), time being of the essence; (ii) on the date that Tenant exercises its option as well as on the date that the Option Period is to commence, no Event of Default (defined below) shall exist and no event shall exist which, by the giving of notice or the passage of time, or both, would mature into an Event of Default; (iii) Tenant shall have exercised all previous options that were capable of being exercised; and (iv) the originally named Tenant has not assigned this Lease or sublet all or any portion of the Demised Premises except in case of Landlords written consent; and (v) Tenant has and continues to fully operate and occupy the Demised Premises for the uses permitted hereunder.

### Section II
### Rent

**2.1 Minimum Rent.** Tenant shall pay to Landlord, without demand, in accordance with the terms hereof, the annual rentals set out on Exhibit B attached hereto (the "Minimum Rent[1]*! Said Minimum Rent shall be paid in equal monthly installments on or before the 1st day of: each month, in advance, without offset, commencing upon. the Rent Commencement Date and continuing through the Lease Term. In the event the Rent Commencement Date is not the first day of a calendar month, then the Minimum Rent due for such first month of the Lease Term shall be prorated based upon the number of days in that month in which the Rent Commencement Date falls notwithstanding. Tenant shall receive three (3) months of minimum rent abatement beginning on the rent commencement date.

**2.2 Percentage Rent** (Intentionally Omitted)

**2.3 Additional Rent.**

**(A) Amount.**
Commencing on the Rent Commencement Date, Tenant shall pay to Landlord at the same time as it is required to make payment of Minimum Rent, an amount (the "Additional Rent") equal to Tenant's Pro Rata Share (defined below) of each of Taxes, Expenses, and Utilities (each as defined below) attributable to the Building for any full or partial calendar year during the Lease Term Notwithstanding anything contained herein to the contrary, Tenant shall not be responsible for any Payments under this Lease that exclusively serve the residential portion of the Building,
**(B** Intentionally Omitted
**(C)** Intentionally Omitted
**(D)** Payment. The Additional Rent shall be paid as follows:

(1)    Prior to any such calendar year or from time to time during any calendar year,

Landlord may notify Tenant as to monthly installments on account of Additional Rent payable by Tenant based on Landlord's reasonable estimate of each of Taxes and Expenses for such calendar year. If Landlord fails to notify Tenant of the amount of any monthly installments for a calendar year, Tenant shall pay monthly installments on account of Additional Rent at the rate last paid by Tenant until service of Landlord's notice. The amount of such installments may be increased by Landlord during any calendar year upon notice to Tenant. On the first day of the calendar month after Landlord's notice of any increase, Tenant shall pay to Landlord (in addition to the revised monthly estimate) a lump sum payment in an amount sufficient to bring total payments to date on account of Additional Rent current, so that such total payments for the calendar year will equal Landlord's revised estimate of Tenant's Additional Rent.

(2)     Additional Rent for the first calendar year in which the Lease Term falls (if the Rent Commencement Date is other than January 1) and the last calendar year in which the Lease Term falls (if the Lease Term ends on a date other than December 31) shall be prorated based upon the number of days in the Lease Term falling within the calendar year in question.

(3)     Following the end of each calendar year during which the Lease Term falls and after Landlord shall have ascertained the actual amount of Taxes and Expenses, Landlord shall notify Tenant as to the amount of Taxes and Expenses and the Additional Rent resulting therefrom (an "Annual Additional Rent Notice[11]") and an itemized breakdown of each of Taxes and Expenses. If the Additional Rent actually due exceeds total estimated payments made by Tenant on account of Additional Rent for such calendar year, then Tenant shall pay Landlord the full amount of any such deficiency within ten (10) days after receiving the Annual Additional Rent Notice. If the Additional Rent actually due is less than the total estimated payments made by Tenant on account of Additional Rent for such calendar year, then Landlord shall credit any such excess to Rent next owing by Tenant; provided, however, at the expiration of the Lease Term, such excess shall be reimbursed to Tenant, so long as Tenant is not then in default under any of its obligations under this Lease.

(A)     **Right to Audit**. Tenant may, at any time after at least five (5) business days' notice to Landlord given within six (6) months after Tenant receives an Annual Additional Rent Notice from Landlord, review Landlord's records of each of Taxes and Expenses for the time -period covered by such Annual Additional-Rent Notice(s). If the review of Landlord's books and records discloses that Tenant's Pro Rata Share of Taxes and Expenses paid by Tenant for the period under review exceeded the actual amount properly allocable to Tenant, then, so long as Tenant is not in default under any of its obligations under this Lease, Landlord shall credit
against Tenant's next accruing Rent obligations an amount equal to such excess together with interest thereon at the Prime Rate from the date of determination until the date actually paid.

(B)     **Definitions of Additional Rent**.

(1)     "Taxes" shall mean all taxes and assessments, special or ordinary, and all other impositions of every kind and nature whatsoever (including, without limitation, any transit tax, sewer rents, impact fee, and school district assessments), which may be levied, assessed, charged or imposed upon the Building and parking garage (including the Common Areas and those facilities constructed for the benefit of Landlord, Tenant, other tenants, occupants and users of the Building) any personal property owned or leased by Landlord and used therewith, the parking garage, together with all fees and costs incurred by Landlord for the purpose of contesting or protesting the amounts or rates of Taxes. Taxes

shall not include any income, excess profit, franchise, capital stock, estate or inheritance tax payable by Landlord except as specifically provided in the next sentence. If at any time during the Lease Term the method of taxation prevailing at the Rent Commencement Date shall be altered so that any new or additional tax assessment, levy, imposition, or charge, or any part thereof, shall be imposed in place or partly in place of any Taxes or contemplated increase therein, including, without limitation, any tax, assessment, levy, imposition or charge on Rent, then all such taxes, assessments, levies, impositions or charges shall be deemed to be Taxes for the purpose hereof, to the extent that such Taxes would be payable if the Building was the only property of Landlord subject to such tax. If any Taxes are or may be payable to the applicable taxing authority in installments over more than one calendar year then, to the extent permitted by its lender, Landlord shall cause such Taxes to be paid in installments, and only those installments payable during a calendar year in which the Lease Term falls shall be included in Taxes for such calendar year in which payment is due. Otherwise, Taxes "for" a calendar year shall be deemed to refer, at Landlord's option, either to Taxes payable in such calendar year or to Taxes levied, assessed or otherwise accrued or imposed for such calendar year without regard to when such Taxes are payable. Taxes shall not include interest and penalties for late payment, except to the extent that such penalty or interest is attributable to Tenant's failure to remit on a timely basis Tenant's Pro Rata Share of Taxes. If such interest or penalty is attributable solely to Tenant's failure to remit Tenant's Pro Rata Share of Taxes, then Tenant shall be solely responsible for payment of such interest and/or penalty. If such interest or penalty is attributable to such failure by Tenant and to! other tenants' failure to pay their pro rata share of Taxes, Tenant shall pay its proportionate share of the amount of such interest and/or penalty.

If Landlord secures a refund of any Taxes for which Tenant has paid Tenant's Pro Rata Share, then, as long as Tenant is not in default under any of its obligations under this Lease, Tenant shall receive Tenant's Pro Rata Share of the amount of refund less all reasonable costs and expenses of securing the refund (including reasonable attorneys' fees). Landlord shall credit any such amount to rent next owing from Tenant; provided, however, at the expiration of the Lease Term, such amount shall be reimbursed to Tenant. Tenant shall be responsible for and shall pay before delinquent all municipal, county, state and federal taxes assessed during the Lease Term against any leasehold interest of Tenant or any property owned by Tenant located in the Demised Premises.

(2)    "Expenses" shall mean all costs and expenses paid or incurred by or on behalf of Landlord for operating, maintaining, repairing, upgrading, replacing, and managing the Building and parking garage, including, without limitation, the costs of heating, cooling and lighting; snow and ice and trash removal; painting; cleaning; landscaping and grounds maintenance; window cleaning; repair and maintenance (including, but not limited to, Landlord's repair and maintenance obligations set forth in Section 5.2 hereof) of Common Areas, Shared Common Areas, roofs, exterior walls, foundation, utility lines, vault spaces and equipment therein (including, without limitation, elevator lifts); maintenance and repair of all personal property of Landlord used or useful in connection with the Building and parking garage; loading docks and truck docks; fuel, gas, water, sewer, steam, electricity and other utility charges (other than utilities metered directly to and paid by other tenants); insurance (including, without limitation, fire and extended coverage, comprehensive public liability and rental loss insurance covering not less than one year of Rent to be paid by all tenants in the Building, worker's compensation and automobile, in limits and upon terms selected by Landlord but not less than those required hereunder) and insurance deductibles; security or traffic control forces or equipment (not to be construed to require Landlord to provide such services or equipment); uniforms; supplies; holiday decorations; costs incurred in connection with the advertisement and promotion of the Building; sales and use taxes on purchased goods; costs of wages, salaries and fringe benefits of persons engaged in the operation, management, maintenance or repair of the

Building; rent attributable to the business office of the Building or other space at the Building occupied by Landlord or the manager of the Building (not to exceed 2000 Rentable Square Feet), to the extent such rent is not in excess of the fair market rental value thereof; an administrative fee equal to eight percent (8%) of all Expenses and a management fee equal to five percent (5%) of the Minimum Rent and any other expense or charge which, in accordance with generally accepted accounting or management principles, would be considered as an expense of operating, maintaining upgrading, replacing, managing, or repairing the Building.

Expenses Shall not include items included within the meaning of the term Taxes; costs of capital improvements to the Building (except as hereinafter provided); depreciation or amortization charges with respect to a capital improvement (except as hereinafter provided); interest and principal payments on mortgages; brokerage and leasing commissions; cost of constructing and installing or reconstructing the Common Areas, Shared Common Areas or the Building; interest and penalties on any Expenses, except to the extent incurred as a result of a default by Tenant in its obligation to make timely payments of Tenant's Pro Rata Share of Expenses (if such interest or penalty is attributable to Tenant's default in its obligation to make timely payments of Tenant's Pro Rata Share of Expenses, then Tenant shall be solely responsible for payment of such interest and/or penalty; if such interest or penalty is attributable to Tenant and to other tenants of the Building, Tenant shall pay its proportionate share of such interest and/or penalty); costs incurred to procure or negotiate leases with any existing or prospective tenants; costs to enforce leases, against other tenants; wages, salaries or other compensation paid to any employee of Landlord above the grade of building or property manager (building-engineer is below the grade of building manager); the cost of correcting any violations in the Building of any applicable Governmental Regulations in existence as of the date of this Lease; cost of construction allowances provided to other tenants; any cost or expenditure for which Landlord is reimbursed solely by other tenants (other than contributions for Taxes and Expenses); and any items for which Landlord is reimbursed by insurance or compensated for due to loss or damage, to the extent of such compensation or reimbursement.

Expenses shall include the cost of any capital improvements made on or after the Rent Commencement Date which are made or installed for the purpose of reducing any cost included within Expenses,/ as well as those which are required under any applicable Governmental Regulations (as defined below) which were not applicable to the Building on the date of this Lease, in each case amortized over the useful life of such capital improvement (as determined in accordance with  generally accepted accounting principles), together with interest on the unamortized cost of such improvement at the prime rate of interest (the "Prime Rate"! published from time to time in *The Wall Street Journal* or, if *The Wall Street Journal* ceases publication, another financial publication reasonably selected by Landlord) on the date the cost of such capital improvement was incurred. If Landlord is not required to provide certain services to all tenants of the Building, but provides such services to Tenant, or to Tenant and some, but not all, tenants of the Building, then the costs of such services shall be apportioned among the tenants provided with such services and Tenant's Pro Rata Share for such services shall be recomputed by the ratio that the Rentable Square Feet of the Demised Premises bears to the Rentable Square. Feet of the total premises of tenants provided with such services. If Tenant is the sole party to whom Landlord provides a service, Tenant shall pay to Landlord the entire cost of such service. To the extent that Expenses include the costs of capital improvements as provided in this paragraph, Landlord shall be permitted to do the same with respect to the costs of leasing such capital item.

If the Building is not at least ninety five percent (95%) fully leased during any portion of any calendar year, Landlord may, using sound accounting practices, adjust Expenses to equal what would have

been incurred by Landlord had the Building been fully leased and occupied (an "Equitable Adjustment" For example, assume (i) the Building has ten (10) stores, each of equal size; (ii) Tenant occupies one store and Tenant's Pro Rata Share is ten percent (10%); (iii) the other nine (9) stores are vacant; (iv) the cost of providing a particular service for Tenant's store is $1,000.. If Tenant paid Tenant's Pro Rata Share of that cost without an Equitable Adjustment, Tenant would only pay ten percent (10%) of $1,000, or $100, which is a disproportionally low amount since Tenant is receiving one hundred, percent (100%) of the benefits of such service. Instead, Landlord, taking into account any economies of scale, will reasonably adjust Expenses to equal what would have been paid by Landlord for such service had the Building been fully leased and occupied. In our example, if the cost of providing such service for a fully leased and occupied Building would be $9,000, Tenant would pay ten percent (10%) of $9,000 or $900 of the $1,000 service for which it receives the sole benefit. On the other hand, if the cost of providing such service for a fully leased and occupied Building is $10,000, Tenant; would pay ten percent (10%) of $10,000 or the full $1,000 of the service for which it receives the full benefit. In no instance, however, shall Tenant pay more than the actual cost of the service for which an Equitable Adjustment is made. In addition, the Equitable Adjustment shall apply only to Expenses which are variable and therefore increase as leasing and occupancy of the Building increases. Landlord may incorporate the Equitable Adjustment in its estimates of Expenses. Notwithstanding anything contained herein to the contrary, the provisions of this Section with respect to adjustment of Expenses for vacancy or as a result of the performance; by tenants of certain services shall apply only to Expenses which are variable and which increase as occupancy in the Building increases and shall not apply to any Expenses which do not vary with the amount of occupancy in the Building.

(3)    "Utilities" shall mean all direct utilities separately sub-metered or proportionately divided to the premises. Such utilities may include but not limited to gas, electric, water, sewage and heating and air conditioning, as further defined in Section VII. The obligation for utilities begins upon receipt of keys.

(4)    "Tenant's Pro Rata Share'* shall mean, as the case may be, Expenses or Taxes multiplied by the 5.84%, which is equal to the Rentable Square Feet of the ground floor space (3,621 Sq Ft) within the Demised Premises, *divided* by the total Rentable Square Feet of the the Building (61,995sf). Tenant's Pro Rata Share as to Expenses or Taxes for Shared Common Areas shall mean the total Expenses or Taxes for the Shared Common Areas, as the case may be, multiplied by a fraction, the numerator of which is the total, floor space in the Building and the denominator of which is the total floor space in the Building and the total floor area of the residential portions of the Project, multiplied by 5.84%. Tenant's Pro Rata Share may be adjusted from time to time upon notice from Landlord on account of any reduction to or expansion of the Demised Premises or the Building, whether from casualty,, condemnation, alteration or otherwise.

**2.4 Payments.**

(A) **Manner of Payments.** The payment of Minimum Rent, Additional Rent and the payment of any other sums due from Tenant to Landlord under this Lease (herein, Minimum Rent, Additional Rent and all such other sums due from Tenant to Landlord under this Lease are collectively referred to as "Rent[1]) shall be made payable to The South Loop Shops, L.L.C. and mailed to c/o SouthLoop Shops, 350 East Devon Ave. Lockbox # 774956 Itasca, IL 60143 unless otherwise notified in writing by Landlord or the then payee. Rent shall be made in lawful money of the United States of America and made payable to Landlord or such other person and at such place as Landlord shall designate in writing from time to time. Tenant's

obligation to pay Rent is independent of any obligation of Landlord hereunder and shall be paid without abatement, reduction, demand or set-off, except as otherwise specifically provided herein. Tenant's obligation to pay Rent (whenever arising or accruing) shall survive the expiration or termination of this Lease on account of a Tenant default, but if the termination is as a result of a termination right specifically granted to Tenant hereunder, the obligation to pay Rent shall survive such termination but only as to the Rent accruing prior to the effective date of such termination.

All sums received from Tenant shall be applied in the following order: (1) Any late charges, (2) Past due Rent, (3) Additional Rent; and (4) Base Rent.

(B) **Late Payments.** Any amount not paid by Tenant within five (5) business days after written notice ("Rent Delinquent Notice") that the same is due shall bear interest at the Prime Rate plus four percent (4%) per annum (the "Interest Rate") from the due date until paid in full. In addition^ if Tenant is delinquent in the payment of any amount for more than five (5) days after the date due, Tenant shall pay to Landlord upon demand an administrative fee equal to Seven Hundred and Fifty 00/100 Dollars ($750.00). Such administrative fee shall be in addition to all of Landlord's other rights and remedies hereunder or at law; It is expressly understood and agreed that if any interest or administrative fee shall remain unpaid that such sums shall be added to the sums which have not been paid when due and shall continue to incur interest and administrative fees until fully paid.

### Section III

### Construction of Building

**3.1 Landlord's Work.**

Landlord agrees that the following shall be operational: HVAC, hot water tank, Cold water and waste are lines to present fixtures and electric service shall be connected to circuit breaker panel. Verification of operation shall be made prior to start of any construction.

**3.2 Tenant's Work.**

(A) **Tenant's Work.** Tenant shall, in accordance with the terms and conditions of this Section 3.2 and Section VI hereof, construct or cause to be constructed, all improvements and all other work, except as stated in Exhibit D, in order to ensure a complete and fully operational sports bar and restaurant , including but not limited to installation of all finishes, furniture, fixtures and equipment, and connections to and extensions from the location of all services provided in the base building and installation of signage in accordance with this Lease (herein "Tenant's Work"). Tenant shall proceed diligently with Tenant's Work in order to have it fully completed and the Demised Premises ready for occupancy by the Rent Commencement Date. Tenant's Work shall be staged at locations reasonably acceptable to Landlord. Prior to commencing Tenant's Work, Tenant shall have obtained and delivered to Landlord true and complete copies' of all permits and other licenses and approvals required by applicable Governmental Regulations to commence and complete Tenant's Work in accordance with Tenant's Plans. Subject to Landlord's contribution, if any, provided in Section 3.2(0 hereof, all of Tenant's Work shall be done at Tenant's sole cost and expense. Tenant shall have the right, subject to Landlord's prior written approval (which shall not be unreasonably Withheld or delayed), to retain its own reputable contractors, designers, engineers and

construction management firm; to perform Tenant's Work. Tenant acknowledges and agrees that Tenant's Work shall be performed in harmony with Landlord's employees, contractors and other tenants, and their respective employees and contractors. Further, Tenant's plans and specifications shall be (i) prepared to be consistent with Landlord's standards, ii) coordinated with Landlord's Work as such work is documented on Landlord's plans, iii) coordinated with actual field conditions and iv) as approved by the Landlord. All tenant's work shall be completed to meet the applicable code requirements and performed within the context of municipal ordinances.

Tenant acknowledges that this Building is part of a mixed use building containing residential, retail, and parking operations and as such its Work may require coordination and scheduling with retail tenants, the One Place Condominiums Association and/or the parking garage manager. Any such needs must be coordinated through the Landlord and not directly with these parties.

Tenant acknowledges that the Building is constructed with post-tensioned concrete and therefore any penetrations to the ceiling, columns and floors (including but not limited to holes or anchoring) must be requested in writing to Landlord. Such request must include dimensioned plans with exact locations of penetrations, the size of the penetrations or material specifications for anchoring, and the corresponding X-ray or GDR evidence that proves such penetrations/anchoring will not impact the structural integrity of the Building. Tenant is fully liable for any and all damages caused by such penetrations regardless of Landlord's consent for Tenant to proceed with work. This paragraph supersedes anything to the contrary noted in this lease. ___/___ ___ **Initials**

All "wet areas" in the bathroom and kitchen must have sub floor water proofing membrane installed to protect water from leaking to the active tenant below. ___ ___ Initials

The tenant shall not make any penetrations or alterations to the existing floor without landlord express permission. Should any alterations or penetrations to the floor be approved by the landlord, in addition to the alterations provisions and requirements in this lease, tenant will also be responsible for ensuring the floors meet the water proofing requirements established by the landlords. HITZ Restaurant Group LLC shall be responsible for all associated costs for installation, testing, and review. ___ ___ Initials

   **(B) Tenant's Plans** Tenant shall submit plans and specifications for Tenant's Work as based on Exhibit B ("Tenant's Plans") (i) to Landlord for its approval, which shall not be unreasonably withheld or delayed and (ii) to the municipality in order to obtain permits. Landlord shall have a period of ten (10) business days after receipt of Tenant's Plans within which to either accept such plans or to make comments and changes thereon. If Landlord does not object to such plans within such ten (10) business day period, Landlord shall be deemed to have accepted the same. If Landlord objects by making reasonable, detailed comments to Tenant's Plans, Tenant shall revise Tenant's Plans in accordance with Landlord's comments and resubmit them to Landlord for acceptance within five (5) business days from the date of receipt of written comments from Landlord. Landlord shall then have five (5) business days after receipt of such revised Tenant's Plans to accept such revised Tenant's Plans. If Landlord fails to timely object to such revised Tenant's Plans, Landlord shall be deemed to have accepted the same. If Landlord objects by making reasonable, detailed comments to the revised portions of Tenant's Plans, the revision process

described herein shall be repeated. Once accepted, Tenant shall not make material changes or material revisions to Tenant's Plans without submitting such changes and revisions to Landlord for its review and acceptance in accordance with the procedures of this Section 3.21B

Landlord agrees that it will not unreasonably withhold acceptance of Tenant's Plans so long as such plans provide for a restaurant and bar with first class quality of finishes and improvements similar to comparable restaurants in the Chicagoland area and so long as such improvements to be made pursuant to Tenant's Plans will comply with all applicable Governmental Regulations and will not contravene, or cause a default under, the terms, conditions and provisions of any lease of space in the Building in effect as of the date hereof. Landlord's acceptance of Tenant's Plans shall in no event subject Landlord to any liability on account of the failure of such plans to comply with applicable Governmental Regulations, or to have been prepared in accordance with sound and generally accepted engineering and architectural practices or otherwise. Tenant shall indemnify, defend and hold Landlord harmless from any claims arising out of Landlord's acceptance of Tenant's Plans. The foregoing indemnity shall survive the expiration or termination of this Lease.

Immediately after the Possession Date, Tenant shall commence and thereafter proceed diligently with the completion of all Tenant's Work (other than Tenant's Work Performed By Landlord) by using licensed labor, in accordance with the terms hereof and the installation of such fixtures, furniture and equipment as may be necessary to prepare the Demised Premises for the operation of business as required herein. Upon completion of Tenant's Work, and prior to or contemporaneously with Tenant opening for business, Tenant shall deliver to Landlord a copy of a certificate of occupancy for the Demised Premises together with copies of all other licenses and permits that are necessary for Tenant's use and occupancy of the Demised Premises, and proper certificates of insurance.

Noise level by contractor shall NOT interfere with the quiet enjoyment of other tenants during their operating hours.

     (C) **Landlord Owned Furniture Fixtures and equipment (FFE)**. Tenant is responsible for taking care of FFE as if it was owned by tenant, including but is not limited to maintaining and repairing all FFE and keeping such FFE in good working order. Tenant is further responsible to return all FFE to landlord at the end of the lease in its original condition, subject to normal wear and tear. Tenant is responsible for ensuring all FFE are in compliance with all applicable laws and codes, including but not limited to OSHA. Tenant is responsible for all cost, fees, losses, damages, penalties, claims, and actions (collectively "claims") whether based on theory of strict liability or otherwise caused or related to the FFE and tenant agrees to hold landlords harmless and reimburse landlord to defend itself against any claims related to the FFE.

           List of landlord FF&E is shown in Exhibit L

**3.3 Tenant's Entry Prior to Possession Date**. Both Landlord and Tenant acknowledge that in order to make the Building and the Demised Premises ready for occupancy in a timely manner, both Landlord's

Work and Tenant's Work must be coordinated and staged and both parties agree to cooperate in such effort. If Tenant enters the Demised Premises prior to the Possession Date, Tenant shah not perform any portion of Tenant's Work if, in Landlord's reasonable judgment, the performance of such work would result in the delay of the performance of Landlord's Work or Tenant's Work Performed By Landlord, if any.

**3.4** **Tenant's Contractors**. All work in the Demised Premises, including, without limitation, Tenant's Work and. Alterations, shall be performed by contractors and subcontractors who possess the requisite experiences, personnel, financial strength and other resources necessary to perform and complete the proposed work in a good, workmanlike, first- class, timely and lien-free manner. Landlord may, from time to time, at any time: (i) request from Tenant evidence satisfactory to Landlord, in its reasonable discretion, that any contractor or subcontractor performing such work in the Demised Premises satisfies the above requirements; (ii) and require Tenant and/or any contractor or subcontractor to furnish evidence that it has obtained the insurance required pursuant to Section IV. Contractors may not park behind building except for loading and unloading up to 30 minutes.

**3.5** **Changes to Building**. Landlord reserves the right at any time and from time to time: (i) to make or permit changes or revisions in its plan for the Building, including, additions to, subtractions from, rearrangements of, alterations of, modifications of, or supplements to, any buildings or Common Area; (ii) to construct other buildings or improvements in the Building and to make alterations thereof or additions thereto and to. build additional stories on any such building or buildings, (iii) to make or permit changes or revisions in the Building, including additions thereto, and to convey portions of the Building to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof; and (iv) convey or ground lease portions of the Building to third parties; provided, however, that no such changes, rearrangements or other construction shall reduce the parking areas provided by Landlord below the number of parking spaces required by applicable law. Notwithstanding anything contained herein to the contrary, Landlord shall not make the changes referenced in this Section 3.5 if said changes materially affect Tenant's use of the Premises.

**3.6** **Zoning** Landlord has obtained zoning approvals, excluding Tenant's special use permits, required by the applicable governmental authorities with respect to Landlord's Work and Tenant's Permitted Use of the Demised Premises (as defined in Section 12.1 hereof). Tenant shall use commercially reasonable efforts to obtain in a timely manner, at its cost and expense, all special use permits, or other zoning approvals required by any applicable governmental authority with respect to any unique aspect of Tenant's Permitted Use or required as a result of any change in the use of the Demised Premises permitted hereunder and any licenses or permits (including liquor licenses and health permits) required by any applicable governmental authority with respect to Tenant's Permitted Use (as defined in Section 12.1 hereof). Both Landlord and Tenant shall cooperate with each other in connection with obtaining the desired approvals, which cooperation shall include the coordination of submissions and hearings before the applicable authorities in the City of Chicago. Tenant shall, within thirty (30) days after the date of this Lease ("Initial Submittal"), submit to Landlord for its review and approval (which shall not be unreasonably withheld) all plans and other submittals needed for any governmental approvals which Tenant is required to obtain under this paragraph and which are obtained prior to construction. As a part of such submittals, Landlord and Tenant shall each mutually agree (each acting reasonably and with diligence) upon the scope and type of items presented as a part of any such

approvals. After Tenant's Initial Submittal, if Tenant requires any other applications or other submittals be made to the City of Chicago for Tenant's governmental approvals, including, but not limited to special use permits, if any, or signage, Tenant shall first submit such applications and submittals to Landlord for its approval, which approval shall not be unreasonably withheld or delayed.

**3.7 City Requirements**. Tenant acknowledges the desire of the City of Chicago to ensure that the exterior of the Demised Premises will be first class in appearance. It is agreed and understood that the City of Chicago may require Tenant to provide such embellishments as window flower boxes, exterior lighting sconces, upgraded exterior materials and/or to limit or restrict the form and number of signs. Tenant agrees to meet the City of Chicago requirements without condition in the Lease.

**3.8 Lease Cancellation**. If the City of Chicago or other governing body rejects tenants application for business license/ liquor license, then this lease will be terminated art no expense to either party, at such instance, the security deposit paid by the tenant will be refunded in its entirety. Tenant will apply for such license within 15 days from the date fully executed lease. If tenant has started construction he shall be responsible to pay all costs incurred. Tenant must either return premises to original condition or finish space as approved.

**Section IV**
**Insurance**

**4.1 Tenant's Insurance.** Tenant shall, at its expense, keep in full force and affect the following insurance policies during the Lease Term and any extension thereof:

    **(A)**  "All risk" insurance, including fire and extended coverage, vandalism, malicious mischief, sprinkler leakage and water damage coverage and demolition and debris removal, insuring the full replacement cost of all of Tenant's Work and all Alterations (defined below) or other improvements or additions to the Demised Premises made at Tenant's expense or direction, and all other property owned or used by Tenant and located in the Demised Premises;

    **(B)**  Broad form commercial general liability insurance (including products/completed operations coverage), contractual liability insurance with respect to obligations under tills Lease and property damage insurance with respect to the Building, the Demised Premises and surrounding areas, with limits to be set by Landlord from time to time in accordance with limits customarily required by prudent owners of first-class centers in the Chicago, Illinois Metropolitan Area comparable to the Building for tenants similar to Tenant but in any event not less than $1,000,000 combined single limit for personal injury, sickness or death or for damage to or destruction of property for any one occurrence;

    **(C)**  Plate glass insurance in an amount equal to the replacement cost of all plate glass located in or on the Demised Premises;

    **(D)**  Worker's compensation and employer's liability insurance in an amount not less than the maximum statutory limits of recovery;

    **(E)**    Other insurance policies as applicable:

        (1)    If Tenant is permitted by Landlord to sell alcoholic beverages from the Demised Premises, host liquor liability (so-called "dram shop") insurance in an amount not less than the maximum statutory limits of recovery;

        (2)    Business interruption insurance and such other insurance against such other risks and in such other amounts, as Landlord may from time to time reasonably require in accordance with limits customarily required by prudent owners of first -class centers in the Chicago, Illinois Metropolitan Area comparable to the Building for tenants similar to Tenant;

        (3)    Automobile liability insurance and such other insurance against such other risks and in such other amounts as Landlord may from time to time require covering owned, non-owned and leased vehicles for limits not less than $2,000,000.00; and

        (4)    During the performance of Tenant's Work and all Alterations, Tenant shall cause Tenant's contractor performing such Work or Alteration and any subcontractors to maintain comprehensive automobile insurance for all owned, hired, rented and non-owned vehicles; broad form general liability insurance, including contractual liability coverage, with the following endorsements, explosion, collapse and underground damage liability; completed operations and products liability and independent contractors protective liability; as well as worker's compensation insurance and employer's liability insurance.

**4.2 Form of Policy.** The form of all such policies and deductibles thereunder shall be subject to Landlord's prior approval, which shall not be unreasonably withheld, delayed or conditioned. All such policies shall be issued by insurers reasonably acceptable to Landlord with a rating equal to or exceeding. A:VII from the most current Best's Insurance Guide and licensed to do business in the State of Illinois and shall contain a waiver of any rights of subrogation thereunder. *In addition, except for worker's compensation and business interruption insurance, the policies shall name Landlord.* Southblock Management, Southloop Shops. LLC, One Place Condominium Association, Kass Management and any other parties designated by Landlord as additional insured *shall* require at least thirty (30) days' prior written notice to Landlord of termination or modification and shall be primary and not contributory. Tenant shall, at least ten (10) days prior to the Rent Commencement Date, and within thirty (30) days prior to the expiration of each such policy, deliver to Landlord certified copies of the policies or certificates (in form and substance reasonably acceptable to Landlord) evidencing the foregoing insurance or renewal thereof, as the case may be.

**4.3 Failure to Carry.** Without limiting Landlord's remedies set forth in Section XIV hereof, in the event that Tenant shall fail to carry, and maintain the insurance coverages set forth in this Section IV. Landlord may, upon ten (10) days prior written notice to Tenant (unless such coverages will lapse within such time period and in which event no such notice shall be necessary) and Tenant's failure to procure the same and deliver reasonably satisfactory evidence thereof to Landlord within said period, procure such policies of insurance and Tenant shall promptly reimburse Landlord the cost thereof with interest thereon after Interest Rate from the date incurred until the date paid.

**4.4 Landlords Insurance.** Landlord shall, during the Lease Term and any extension thereof, maintain an "all risk" hazard insurance policy (with replacement cost coverage) for the Building in an amount required to avoid the application of any coinsurance provision (exclusive of foundations and footings and exclusive of any portion of the Building leased to a party that is obligated, pursuant to its lease, to insure the full replacement cost of such portion of the Building), together with rent insurance in an amount equal to one (1) year's rent from all tenants of the Building as well as broad form commercial general liability insurance, contractual liability insurance, property damage insurance with respect to the Building, with limits to be set by Landlord from time to. The cost of all such insurance shall be deemed to be an Expense hereunder. Tenant shall reimburse Landlord an amount equal to any increase in Landlord's insurance premiums resulting from Tenant's specific use of the Demised Premises or any act or omission of Tenant or the Tenant Parties (as defined below).

**4.5. Priority of Insurance Waiver.** Landlord and Tenant, in the exercise of their commercial business judgment, acknowledge that the use of insurance is the best way to protect against the risk of loss to their respective properties and economic interests in the Building and the Demised Premises. Accordingly, Landlord and Tenant agree that in the event of loss or damage to their respective properties or interests, such loss will be satisfied by the insurance proceeds paid to the party suffering the loss, next by the additional insurance proceeds that would have been paid to the party suffering the loss had the insurance required hereunder been carried by such party, and finally, by the party causing the loss or damage.

**Section V**
**Repairs and Maintenance**

**5.1 Tenant's Obligations.** Tenant shall maintain the Demised Premises in a clean, sanitary and safe condition and, except as specifically provided in Section 5.2 below, Tenant shall make and pay for all cleaning, maintenance, pest control, replacement and repair necessary to keep the Demised Premises in a good state of repair consistent with a first-class establishment, in compliance with all Governmental Regulations and in tenantable, safe condition. Without in any way limiting the generality of the preceding sentence, Tenant's obligations under this Section 5.1 shall include the obligation to maintain, replace or repair, in the manner required herein, all interior and exterior signage, the interior and exterior portion of all doors, door frames, door checks, windows, window frames, plate glass, storefront and partitions separating the Demised Premises from the Common Areas and all equipment, elevators, escalators, facilities and fixtures (including hardware, electrical, plumbing and heating, ventilating and air conditioning facilities) exclusively serving the Demised Premises (but excluding any equipment, facilities and fixtures that run through, but do not serve, the Demised Premises). Tenant shall contract and pay for a qualified service contractor reasonably acceptable to Landlord to adjust, clean and repair the heating, ventilating and air conditioning equipment on a schedule reasonably acceptable to Landlord and in accordance with the manufacturer's instructions. Tenant shall, at its own expense, install and maintain fire extinguishers and other fire protection devices as may be required from time to time by any agency having jurisdiction or the insurance underwriters insuring the Building in which the Demised Premises is located. No trash or garbage shall be stored in the Demised Premises for an excess of twenty-four (24) hours and all trash or garbage shall be disposed of in containers or areas designated from time to time by Landlord. Tenant shall separate all recyclable items to the extent reasonably practical taking into account the cost so as to comply with any recycling efforts which may be undertaken from time to time by applicable governmental authorities, by

Landlord with respect to the Building or by the provider of the trash removal services.

**5.2 Landlord's Obligations.** The following maintenance, repair or replacement shall remain Landlord's sole responsibility which Landlord covenants to perform in a manner consistent with a first-class shopping center:

> **(A)**   all maintenance, replacement and repair to the roof, floor slabs, outer walls, foundations and structural portions of the Building (other than doors, door frames, door checks, windows, window frames, plate glass and storefronts) which shall be necessary to maintain the Building in a safe, dry and tenantable condition, in good order and repair in compliance with all Governmental Regulations;

> **(B)**   all maintenance, replacement and repair of utilities located at and servicing the Building except those located within and exclusively servicing the Demised Premises and those that others of the tenants of the Building are obligated to maintain, repair or replace as necessary to keep such utilities in good operating order;

> **(C)**   all maintenance, replacement and repairs(including sweeping, striping and snow and ice removal) necessary to maintain all sidewalks serving the Building and all Common Areas free of all settling, clear of standing water and in a safe, sightly and serviceable condition.

Tenant shall pay Landlord its Pro Rata Share of Landlord's cost of complying with Landlord's maintenance, replacement and repair obligations contained in this Section 5.2. all in accordance with and as limited by the provisions of Section 2.3 hereof.

**Section VI**
**Alterations**

**6.1 Alterations.** All improvements or alterations in or additions, changes or installations to the Demised Premises (an "Alteration"! performed by or on behalf of Tenant shall be governed by this Section VI. Tenant may make Alterations in the interior of the Demised Premises as Tenant may deem necessary or desirable in connection with the operation of the Demised Premises (without the consent of, but with prior notice to, Landlord) if and to the extent that: (i) an Event of Default does not then exist hereunder; (ii) such interior Alterations (a) do not impact the structural components of the Demised Premises or any improvements located at the Building, including, but not limited to, the foundation, load bearing walls, structural steel, footings and roofs, or (b)-do not impact the heating, air conditioning, ventilation,- electrical- plumbing, utility :or mechanical systems of any improvements located at the Building or (c) do not impact any other tenant's premises or uses and are not visible (other than in a manner consistent with the general appearance of the Demised Premises as a first-class sports bar and restaurant and consistent with the standards of decency and morality prevailing in the community in which the Building is located) from the outside of the Demised Premises, or (d) do not impact the store front or facade of the Demised Premises or the Building, or (e) do not diminish the value, utility and marketability of the Building; (iii) such Alterations are consistent with the quality utilized in the initial build-out of the Demised Premises in accordance with Tenant's Plans and (iv) the cost of any such interior Alteration does not exceed $15,000.00. Except as specifically set forth above, Tenant shall not make any other Alterations to the

Demised Premises without in each instance first obtaining the prior written consent of Landlord, which shall not be unreasonably withheld. Tenant's alterations must comply with all provisions outlined in Section 3.2.

**6.2** **Procedures.** Prior to commencing any Alteration, Tenant shall submit to Landlord: (i) detailed plans and specifications (to be submitted and, where Landlord's consent is required pursuant to Section 6.1, approved in accordance with Section YD: (ii) sworn statements, including the names, addresses and copies of contracts with all contractors; (iii) all necessary permits evidencing compliance with all Governmental Regulations; (iv) certificates of insurance from Tenant, its contractors and subcontractors in form and amounts reasonably required by Landlord, naming Landlord and any other parties designated by Landlord as an additional insured; and (v) all other documents and information as Landlord may reasonably request in connection with such Alteration. If Landlord's consent to the Alteration is required under Section 6.1. Tenant shall not commence such Alteration until it has submitted the above described items and has received Landlord's prior written acceptance of the proposed Alteration and the items set forth above. Where applicable, Landlord shall notify Tenant of its acceptance or disapproval of such Alteration and the plans and specifications thereof within ten (10) business days of receipt of the above described material. Tenant agrees to pay Landlord's reasonable standard charges for review of all such items. Neither acceptance of the plans and specifications nor supervision of the Alteration by Landlord shall constitute a representation or warranty by Landlord as to the accuracy, adequacy, sufficiency or propriety of such plans and specifications or the quality of workmanship or the compliance of such Alteration with Governmental Regulations. Tenant shall indemnify, defend and hold Landlord harmless from any claims arising out of Landlord's acceptance of Tenant's plans and specifications for such Alteration. Tire foregoing indemnity shall survive the expiration or termination of this Lease.

**6.2.1** **Location of construction dumpster shall be designated by Management Company.**

**6.3** **Performance.** Tenant shall pay the entire cost of any Alteration permitted hereunder and shall provide Landlord as security for the payment and completion of the alteration with evidence that Tenant has 125% of the construction costs segregated its own account and available solely for the Alterations with bank which same may be verified by Landlord and must be evidenced in writing by Agent prior to the commencement of the Alteration or an equivalent irrevocable letter of credit. Such shall only be released after receipt of final waivers from general contractors his subs and suppliers All Alterations shall meet or exceed the standards for construction and quality of materials utilized by Tenant in the construction of Tenant's Work; shall be performed in a good, workmanlike and first-class lien free manner, using new materials, in accordance with the plans and specifications submitted to and, if required pursuant to Section 6.1. Approved by Landlord; in compliance with all applicable Governmental Regulations, in accordance with all of the terms of this Lease applicable to Alterations or Tenant's Work; and with licensed, insured and reputable contractors and subcontractors satisfying the criteria set forth in Section 3.4. To the extent Tenant revises any plans and specifications, Tenant shall re-submit such plans and specifications to Landlord contemporaneously with such changes and, if Landlord's approval was initially required, Tenant shall obtain Landlord's approval to such revision prior to commencing any work with respect to such revision. Tenant shall cause all Alterations to be performed in such manner so as not to (i) obstruct access to the Demised Premises of any other tenant in the Building or any part of the Common Areas or disrupt any building service or equipment or any of other tenants' equipment; (ii) interfere with any work being

performed by Landlord, other tenants or their respective contractors and subcontractors; or (iii) permit or allow any labor dispute or disruption, work stoppage, or picketing anywhere within or outside of the Building.

Tenant shall, at its sole cost and expense, file all plans and specifications for Alterations, as required by all Governmental Regulations with copies to landlord. In conjunction tenant shall furnish landlord with a contractor's statement stating each contractor name, trade, work, and cost. If Landlord, in its sole and absolute discretion, consents to an Alteration which may impact a building system or may impact the Building's structure or roof, Tenant shall only perform such Alterations by using those contractors and subcontractors satisfactory to Landlord. All Alterations shall be staged in areas reasonably acceptable to Landlord.

6.4 **Removal by Tenant.** All of Tenant's Work as well as each Alteration or other improvement made by Tenant in or upon the Demised Premises (excepting only Tenant's furniture, equipment and trade fixtures), whether temporary or permanent in character, shall become Landlord's property upon its attachment to the Demised Premises and shall remain upon the Demised Premises at the expiration or termination of this Lease without compensation to Tenant; provided, however, that Landlord shall have the right to require Tenant to remove any Alteration and restore the Demised Premises to the condition existing immediately prior to the Alteration, all at Tenant's sole cost and expense.

6.5 **Liens.** Tenant agrees to keep all of the portions of the Building free and clear of all liens arising out of, or claimed by reason of, any work performed, material furnished or obligations incurred by or at the insistence of Tenant, and to indemnify and save Landlord and its agents and employees harmless from all such liens or claims of lien and all attorneys' fees or other costs and expenses incurred by reason thereof. Upon completion of any Alteration, Tenant shall promptly furnish Landlord with final sworn owner's and contractors' statements and full and final waivers of lien covering all labor and materials included in such Alteration. Should Tenant within thirty (30) days after written notice from Landlord fail to: (i) fully discharge any lien or claim of lien, or (ii) insure or bond 150% over such lien by title endorsement or bond satisfactory to Landlord and Landlord's lender, if any (which endorsement or bond shall also cover costs of defense), Landlord may, at its option and without limitation of any of its other rights and remedies, pay the same or any part thereof, and the amount of such payment shall be due and owing to Landlord from Tenant with interest thereon at the Interest Rate from the date incurred until the date paid in full. Such amount shaft be deemed to be rent under this Lease as of the date of such payment by Landlord. No liens of any character whatsoever created or suffered by Tenant shall in any way, or to any extent, attach to or effect the rights of Landlord in the Demised Premises, the Real Estate or the Building.

6.6 **Survival.** Tenant's obligations in this Section VI shall survive the expiration or termination of this Lease.

**Section VII**
**Utilities**

As of the Possession Date, the Demised Premises shall have access to gas, electric, telephone, water, sewer, HVAC and other utilities Work sufficient to enable Tenant to complete its connection to such utilities in accordance with Tenant's Work. Tenant shall be responsible for making such connections and for contracting with the applicable utility providing such service if a direct contract is available. Tenant shall cause the Demised Premises to be separately metered from the remainder of the Building to the extent permitted by Landlord. From and after the Possession Date, Tenant shall pay all charges for utility services

furnished to the Demised Premises during the performance of Tenant's Work and during the Lease Term. If any utility is not separately metered, Tenant shall pay for the same at a fair and equitable rate and formula to be mutually agreed upon by the parties at the earliest practicable date. Tenant may use a telecommunications company of its choice but will notify Landlord of the identity of such company.

## Section VIII
## Governmental Regulations

Tenant shall observe and comply and cause the Demised Premises to comply with all instruments of record that burden the Real Estate and all requirements, rules, orders, codes, permits and fees and regulations of the federal, state and municipal governments or other duly constituted public authority, and of any board of insurance regulators or underwriters, health officer, fire marshal, and/or building inspector affecting or relating to the Demised Premises, the business conducted in the Demised Premises and Tenant's use of the Demised Premises including the making of Alterations (collectively, "Governmental Regulations"^. However, in the event such Governmental Regulations shall either: (i) require the removal of asbestos or other hazardous materials from the Demised Premises which Tenant is not required to remove; or (ii) require structural changes to the Demised Premises, including, but not limited to, the erection of fire escapes or exits not otherwise included as a part of Tenant's Work; then Landlord shall comply with the same on behalf of Tenant. If such work by Landlord is required solely on account of Tenant's use or occupancy of the Demised Premises, Tenant shall reimburse Landlord on demand for the cost of such compliance. If such compliance relates to the Demised Premises as well as other portions of the Building, Tenant shall pay Landlord on demand its proportionate share of the actual cost of such compliance as Additional Rent.

## Section IX
## Damage to Demised Premises

**9.1 Destruction of Premises**. Subject to the immediately succeeding sentence, if the Demised Premises or the Building are totally or partially damaged or destroyed by fire or other casualty, Landlord shall (i) restore the damage to the Demised Premises with respect to Landlord's Work and Tenant's Work Performed by Landlord, if any, to the same condition as existed on the Possession Date and (ii) with respect to remainder of the Building,
either restore the Building (other than the Demised Premises and those portions of the Building leased to a tenant for which such tenant has restoration responsibility) to the condition that existed immediately prior to such casualty or clear portions of the Building that Landlord decides not to rebuild, with the understanding that the remaining Building is to be an attractive, architectural whole with parking in compliance with applicable Governmental Regulations and reasonably restore ingress, egress and traffic circulation. Notwithstanding the foregoing, if (a) the casualty results in damage to the Building which will (as reasonably determined by a registered architect engaged by Landlord who will certify to Landlord and Tenant within thirty (30) days after the event causing the damage the amount of time needed to. restore) take in excess of (y) twelve (12) months from the beginning of restoration to restore the Building to the same condition as existed on the Possession Date, using standard working methods, at any time during the Lease Term, or (z) six (6) months from the beginning of restoration to restore the Building to the same condition as existed on the Possession Date and occurs during the last two (2) years of the Lease Term, as extended; or (b) the repair, restoration or reconstruction is prohibited by any zoning ordinance, building code or other applicable Governmental Regulation affecting the Demised Premises or the Building, which

in Landlord's commercially reasonable determination, makes the rebuilding of the Building as a first-class retail center not economically viable, then in any such instance Landlord may elect to terminate this Lease upon giving notice of such election in writing to Tenant within sixty (60) days after the occurrence of the event causing the damage. If Landlord is required or elects to rebuild as herein provided (but subject to Tenant's right to terminate in certain circumstances as set forth in Section 9.2 below), Landlord shall commence the repair, restoration or rebuilding thereof within ninety (90) days after such damage (subject to delays in the adjustment of insurance) and shall substantially complete such restoration, repair or rebuilding of the Demised Premises with respect to Landlord's Work and Tenant's Work Performed by Landlord, if any has performed, to the same condition as existed on the Possession Date as promptly; as practicable after the commencement thereof, subject to delays caused by events of Force Majeure or Tenant Delays and the provisions of the first sentence of this Section 9.1.

Tenant shall, at Tenant's sole cost and expense and in accordance with Section III and Section VI hereof, repair, restore or rebuild in the Demised Premises those improvements constituting Tenant's Work and subsequent Alterations using substantially the same quality of materials and workmanship as originally used. Tenant shall complete such restoration and repair of the Demised Premises within ninety (90) days after Landlord delivers the Demised Premises to Tenant and restore the same in substantially the same condition required by this Section 9.1. If the fire or other casualty or the repair, restoration or rebuilding required by Landlord shall render the Demised Premises untenantable in whole or in part, (i) the Minimum Rent shall proportionately abate from the date when the damage occurred until the date on which the Demised Premises are in the condition required as of the Possession Date (subject to the provisions of Section 1.4 with respect to Tenant Delays), such proportion to be computed on the basis that the Rentable Square Feet of the portion of the Demised Premises rendered untenantable and not occupied by Tenant bears to the aggregate Rentable Square Feet, of the.. Demised Premises, and (ii) the Breakpoint shall be equitably reduced to reflect both the period during which the business located at tire Demised Premises was not operated (or was operated on a reduced basis) and Rentable Square Feet of the Demised Premises rendered untenantable, such reduction to be agreed to by Landlord and Tenant, each acting reasonably.

If Landlord elects to terminate this Lease by notice as provided above, or Tenant elects to terminate this Lease by notice as provided in Section 9.2 below, such termination shall be effective on the date specified in the first notice received by the other party, but no earlier than thirty (30) days after the occurrence of the event causing such damage. In such event, Tenant shall be obligated, subject to the abatement provided above, to pay the Rent accrued to tire effective date of such termination, which obligation shall survive such termination.
In the event Landlord's fire and extended coverage insurance provides for a deductible amount, and a. loss occurs which is the type of risk otherwise insured under the policy, then Tenant shall pay to Landlord, promptly upon being billed therefor, the lesser of (i) the amount of the loss, or (ii) the amount of the deductible or, if the loss covers more than the Demised Premises, Tenant's proportionate share of such loss or deductible.

**9.2 Tenant's Right to Terminate.** If the architect determines in accordance with Section 9.1 above that the casualty resulted in damage to the Demised Premises which will take in excess of six (6) months from the beginning of restoration to restore Tenant's Work and subsequent Alterations and occurs during the last one (1) year of the Lease Term, as extended, or the repair, restoration or reconstruction is prohibited by any zoning ordinance, building code or other applicable Governmental Regulation affecting the Demised Premises then Tenant may elect to terminate this Lease upon giving notice ("Tenant's Termination

Notice") of such election in writing to Landlord within forty-five (45) days after the event causing the damage. If Tenant fails to serve the Tenant's Termination Notice upon Landlord within the time specified herein, Tenant shall be deemed to have waived its right to terminate this Lease.

Unless this Lease is terminated by either party as provided in this Section IX. this Lease shall remain in full force and effect, notwithstanding such damage or casualty.

**Section X**
**Eminent Domain**

**10.1 Total Condemnation.** In the event of a Substantial Taking of the Building (defined below), Landlord shall have the right to terminate this Lease by written notice to Tenant within thirty (30) days of the date of the effectiveness of such taking. In the event of a Substantial Taking of the Demised Premises (defined below), Tenant shall have the right to terminate this Lease by giving written notice to Landlord within thirty (30) days of the effectiveness of such taking. "Substantial Taking of the Building'* means a Taking (defined below) either of (i) the entire Building; or (ii) a portion thereof, and in Landlord's commercially reasonable opinion, the remainder of the Building cannot be restored to an economically viable first-class retail center without either substantial alteration of the Building or relief from Governmental Regulation or the requirements of any leases then in effect with respect to the Building. "Substantial Taking of the Demised Premises" means Taking of either (a) the entire- Demised Premises or (b) at least twenty-five percent (25%) of the Demised Premises such that the remainder is, in Tenant's commercially reasonable opinion, be used for the purposes set forth in this Lease as an economically viable first-class sports bar and restaurant. "Taking" means a taking or condemnation for a public or quasi-public use by a competent governmental authority. In the event this Lease is terminated pursuant to this Section 10.L the Lease Term shall terminate upon the earlier of delivery of possession to the condemning authority or the effective date of the Taking and Tenant shall pay the Rent accruing to the date of termination. If neither Landlord nor Tenant terminates this Lease within the applicable time period, this Lease shall continue in full force and effect, as modified pursuant to Section 10.2.

**10.2 Partial Condemnation.** If a Taking occurs that does not entitle Landlord or Tenant to terminate this Lease pursuant to Section X or if neither Landlord nor Tenant exercises a right to terminate this Lease granted pursuant to Section 10.1. Landlord and Tenant shall restore the Building and Demised Premises, as required by this Section 10.2. Upon such condemnation, Landlord shall repair and restore the Building and, if applicable, the Demised Premises with respect to Landlord's Work and Tenant's Work Performed by Landlord, if any, to the extent practicable, to the condition as existed on the Possession Date, except that Landlord shall not hereby be required to expend for repair and restoration any sum in excess of an amount equal to the Award (defined below) and Landlord's obligations with respect to Tenant's Work Performed by Landlord, if any is performed, are limited as provided in Section 9.1 above. However, if Landlord does not have sufficient proceeds to substantially complete such repair and restoration and Landlord elects not to refund any such shortfall, Landlord shall so notify Tenant within not more than ninety (90) days after the date of the condemnation and Tenant, within thirty (30) days after receipt of such notice, shall have the right to either terminate this Lease by the giving of written notice to Landlord within said thirty (30) day period or provide Landlord with the funds necessary to pay such shortfall, in which event (i) Landlord shall repair and restore the Demised Premises with respect to Landlord's Work to the extent practicable, to the condition as existed on the Possession Date and (ii) Tenant can, at the expiration of the initial Lease Term, remain in the Demised Premises and offset against its Rent obligations that would otherwise fall due within such period (as if the Lease Term had been extended without giving effect to any Option Period) the

amount of the shortfall so paid by Tenant until such offset is used up at which point this Lease shall terminate (subject to extension as provided in Section 1.5). If Tenant fails to provide such notice within said thirty (30) day period, Tenant will be deemed to have waived its right to terminate this Lease pursuant to the terms and conditions of this Section 10.2: and Landlord shall repair and restore the Building and, if applicable, the Demised Premises with respect to Landlord's Work and Tenant's Work Performed by Landlord, if any has been performed, to the extent practicable to the condition as existed on the Possession Date given the Award made available to Landlord's lender and this Lease shall continue in full force and effect. Tenant shall, at its cost and expense and in accordance with Section 6 hereof, repair and restore in the Demised Premises those improvements constituting Tenant's Work as well as subsequent Alterations, using substantially the same quality of materials and workmanship as originally used. If as a result of the Taking, the Rentable Square Feet of the Demised Premises are permanently reduced, (a) Minimum Rent and Additional Rent shall proportionately abate from the date when possession of such portion of the Demised Premises is given to the condemning authority and (b) the Breakpoint shall be .equitably reduced to reflect the reduced Rentable Square Feet comprising the. Demised Premises,- such reduction to be agreed to by Landlord and Tenant, each acting reasonably. In addition, if the repair, restoration or rebuilding required by Landlord as a result of such Taking shall render the Demised Premises untenantable in whole or in part, (y) Minimum Rent and Additional Rent shall proportionately abate from the date when possession of the Demised Premises is given to the condemning authority until the date on which the Demised Premises are, as nearly as practicable, in th6 condition as existed on the Possession Date, and (z) the Breakpoint shall be equitably reduced to reflect both the period during which the business located at the Demised Premises was not operated (or was operated on a reduced basis) and the Rentable Square Feet of the Demised Premises rendered untenantable, such reduction to be agreed to by Landlord and Tenant, each acting reasonably. The proportionate abatement shall be computed on the basis that the Rentable Square Feet of the Demised Premises either reduced or rendered untenantable and not occupied by Tenant bears to the aggregate Rentable Square Feet area of the Demised Premises.

10.3 **Award**. Any award, compensation or damages (the "Awards for a partial or total taking shall be paid to and be the sole property of Landlord whether the Award shall be made as compensation for diminution of the value of the leasehold estate or the fee of the Building and- the Real Estate or otherwise, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all of the Award; provided that, Tenant shall have the right, to: the extent the Award is not diminished, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving and damage to Tenant's Work (excluding those portions of Tenant's work paid for by Landlord's Contribution)] and Alterations (but not Tenant's Work), if a separate award for such items is made to Tenant. Any portion of the Award which is not required to be expended by Landlord for repairing or restoration shall be retained by Landlord as Landlord's sole property.

## Section XI

## Assignment and Subletting

11. 1 **Assignment and Subletting**.

**(A) Intentionally Omitted**

**(B) Intentionally Omitted**

**(C)** have the right to assign its rights hereunder or sublease all or a part of the Demised Premises with the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned. Tenant shall, by notice in writing, advise Landlord of its desire to, on and after a stated date (which shall not be less than sixty (60) days after the date of Tenant's notice), assign this Lease or sublet any part or all of the Demised Premises for the balance or any part of the Lease Term. Tenant's notice shall request Landlord's consent to such transaction and shall include the name and address of the proposed assignee or subtenant, and sufficient information as Landlord deems necessary to permit Landlord to determine the appropriateness of the assignee or subtenant, including but not limited to evidence of financial wherewithal, pursuant to the provisions of this <u>Section 11</u>

Landlord shall be deemed to have reasonably withheld its consent to an assignment or sublease if Landlord's consent is withheld because: (i) an Event of Default then exists hereunder; (ii) in the event of a sublease, the portion of the Demised Premises which Tenant proposes to sublease, including the means of ingress thereto and egress therefrom, or the proposed use thereof, or the remaining portion of the Demised Premises, or any combination of the above, either is insufficient, in Landlord's reasonable opinion for the proposed use of the Demised Premises, or for general retail purposes, or will violate any Governmental Regulations, including, without limitation, any applicable building code or zoning ordinances; (iii) the proposed use of the Demised Premises by the subtenant or assignee would violate either the provisions of <u>Section 12</u> or the terms of any instrument affecting the Real Estate, including, but not limited to a conflict with any then existing exclusive uses; (iv) in the reasonable judgment of Landlord, the proposed subtenant or assignee has a reputation, or is engaged in a business, that would be deleterious to the reputation of the Building or is not sufficiently financially responsible to perform its obligations under the proposed sublease or assignment; (v) the proposed subtenant or assignee is a government or a government agency or any other entity that would result in the Demised Premises or Building being treated as "tax-exempt use property" within the meaning of Section 168(h) of the Internal Revenue Code of 1986, as amended; (vi) the proposed subtenant or assignee has less than two (2) years successful experience in operating a business similar to the business of Tenant as described in this Lease; (vii) the proposed subtenant or assignee has a tangible net worth which is lower than that of Tenant at the time of the subletting or assignment (or at the time of execution and delivery of this Lease, if greater); (viii) the proposed subtenant or assignee is either a prospective or current tenant of the Building or the parent, subsidiary or affiliate thereof; or (ix) the proposed assignment or sublease would result in a prohibited transaction under ERISA (defined below). Prior to, and as a condition of the effectiveness of any such sublease or assignment, Tenant shall deliver to Landlord true and complete copies of the documents evidencing such assignment or sublease conforming to the requirements of this Lease. During the Option Period, item VII above . (net worth) is deemed satisfied if a proposed subtenant <u>or</u> assignee that has a tangible net worth of $1,000,000 excluding any value associated with this lease and its business net worth.

**11.2 Intentionally Omitted**

**11.3<u>Tenant to Remain Obligated</u>**. Neither consent by Landlord to any Transfer (as defined in <u>Section 11.9</u> below) nor the occurrence of a Transfer that does not require Landlord's consent, shall not relieve Tenant from any covenant, liability or obligation hereunder (whether past, present or future), including,. without limitation, the obligation to pay: Rent or be deemed to be a consent to any subsequent Transfer. Tenant shall pay all of Landlord's reasonable costs, charges and expenses, including without limitation, reasonable attorneys' fees, incurred in connection with any Transfer requested or made by Tenant, up to a

maximum of $1,000.oo. Any consent by the landlord to any assignment of lease shall release the tenant from any and all of its obligations only by written approval by landlord.

**11.4 <u>Assignee to Assume Obligations</u>.** If Tenant shall assign this Lease as permitted herein, the assignee shall expressly assume all of the obligations of Tenant hereunder from and after the date of assignment and agree to comply with and be bound by all of the terms, provisions and conditions of this Lease. Such assumption shall be evidenced in a written instrument satisfactory to Landlord, the execution form of which shall be furnished to Landlord not later than fifteen (15) days prior to the effective date of the assignment. If Tenant shall sublease the Demised Premises as permitted herein, Tenant shall obtain and furnish to Landlord, not later than fifteen (15) days prior to the effective date of such sublease and in form satisfactory to Landlord, the written agreement of such subtenant that it shall comply with and be bound by all of the terms, provisions and conditions of this Lease and that it will torn to Landlord, at Landlord's option and written request, in the event this Lease terminates before the expiration of the sublease. If subsequent to a Transfer, the transferee's obligations are rejected or disaffirmed as the result of a Bankruptcy Event (defined below), the transferor of such Transfer will not be relieved of its obligations under this Lease as a result thereof.

**11.5 <u>Rent</u>.** Intentionally Omitted.


**11.6 <u>Excess Rent</u>.** If Tenant, having first obtained Landlord's consent to any assignment or sublease, or if Tenant or a trustee in bankruptcy for Tenant pursuant to the United States Bankruptcy Code, shall assign this Lease or sublet the Demised Premises, or any part thereof at a rental or for other consideration in excess of the Minimum Rent due and payable by Tenant under this Lease, then Tenant shall pay to Landlord as Additional Rent one hundred percent (100%) of such excess rent or other consideration within ten (10) days after Tenant's receipt thereof from time to time.

**11.7 <u>Change of Control</u>.** Any transfer (including, without limitation, any dissolution, merger, consolidation, or other reorganization of Tenant but excluding the transfer or exchange of any publicly traded stock) or any issuance, sale, gift, transfer or redemption of any capital stock of Tenant or other interest in Tenant (whether voluntary, involuntary or by operation of law, or any combination of the foregoing) of the direct or indirect power to affect the management or policies of Tenant or any direct or indirect change in twenty- five percent (25%) or more of the ownership interest in Tenant shall constitute a Transfer subject to the provisions of this <u>Section XI</u>.

**11.8 <u>Event of Default</u>.** Any Transfer without Landlord's prior written consent excluding the transfers as made in accordance with the guidelines set forth in section 11.1 shall be of no effect and shall, at the option of Landlord, constitute an Event of Default under this Lease without any further notice or cure period.

**11.9 <u>Transfers</u>.** Except as specifically set forth above in this <u>Section XL</u> Tenant shall not, without the prior written consent of Landlord in each instance, which consent may be withheld by Landlord in its sole and absolute discretion: (i) assign, transfer, mortgage, pledge* hypothecate or encumber or subject to or permit to exist upon or be subjected to any lien or charge, this Lease or any interest under it; (ii) allow to exist or occur any transfer of or lien upon this Lease or Tenant's interest herein by operation of law or otherwise; or (iii) sublet the Demised Premises or any part thereof (individually or collectively, all of such items in clauses (i) through (iii), are referred to as a 'Transfer').

**Section XII**
**Use and Operation of the Building & Exclusive**

**12.1 Permitted Use.** Subject to compliance with Governmental Regulations, Tenant shall occupy and use the Demised Premises only under the name HITZ (the "Trade Name"") and for the use as a sit in and carry out restaurant (the "Permitted Use[11]") and will not use any other name or conduct any other business on the Demised Premises without Landlord's prior written consent. Tenant will conduct such business in the same manner as is typically conducted by -similar first-class Restaurant in the Chicago-Metropolitan Area. Tenant represents and warrants to Landlord that it has the right to use the Trade Name. Tenant hereby grants Landlord the right to use the Trade Name and any associated trademark or logo in the promotion of the Building with its prior written permission, which shall not be unreasonably withheld, delayed or conditioned.

**12.2 Prohibited Uses.** Any business constructed or operated in the. Demised Premises shall be consistent with the operation of a family-type, retail shopping area and shall be attractive, both in its physical characteristics and in appeal, to customers and retail trade. Tenant shall not use any portion of the Common Areas, or any exterior, area of the Demised Premises, for the sale or display of any merchandise, or any other business purpose. Tenant shall not:, (i) solicit business, picket or distribute any handbills or other advertising or written materials, (including magazines or newspapers) in the Common Areas; (ii) install amplifiers, or similar devices, or employ any advertising medium in the Demised Premises or the Common Areas that may be heard or experienced outside the Demised Premises, such as flashing lights, spotlights, loudspeakers or phonographs which violate local ordinances or codes or materially disturb other tenants or owners of the building; (iii) burn any papers, trash or garbage of any kind; (iv) load or unload any truck or delivery vehicle, except in the areas designated by Landlord for such purposes and then only at such times as shall be permitted by the City of Chicago, provided the same does not disturb the residential tenants; or (v) sell or display merchandise in areas outside the Demised Premises or in the Common Areas or use the Common Areas for any other business, occupation or undertaking. No use of the Demised Premises shall interfere with the use of the Common Areas or impede the free flow of pedestrian or vehicular traffic and no objectionable odors or noise shall emanate from or be dispelled from the Demised Premises. No auction, liquidation, going out of business, fire or bankruptcy sales may be conducted from the Demised Premises.

The following uses or operations, or any uses or operations that are accompanied by the following characteristics are prohibited in the Demised Premises: any use which is not consistent with a first-class bar and restaurant, the uses set forth on Exhibit L or swap shop, "outlet store" or other store selling merchandise that is used, damaged or discontinued; bowling alley; arcade; skating rink; billiard room; bar,        or pub (except as incident to a full kitchen restaurant operation or in connection with the operation of a first-class bar or other first- class themed bar), package liquor store, vitamin store, ballroom, dance hall, bakery, discotheque, beauty shop, barber college, health club, general offices purposes; theater, place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers; for the sale, lease, exchange, display, exhibition or advertisement of any goods, services, items, products or materials which, in Landlord's reasonable judgment (i) are pornographic, obscene, graphically violent, lewd or lascivious or otherwise are not consistent with the standards of decency and morality prevailing in the community

where the Building is located, (ii) may damage or tarnish the reputation of Landlord or the Building, (iii) would unreasonably annoy or disturb any other tenant of the Building, (iv) constitutes the sale of paraphernalia used for the consumption of,; or otherwise associated with, illegal or dangerous drugs, or (v) would constitute a public or private nuisance or would generate excessive noise, light, litter, dust, dirt or odor. Tenant acknowledges that Landlord^ reputation will be-injured, and/or the value of the Building will be diminished if the Demised Premises are used for any of the purposes set forth in this Section 12.2. Therefore, in addition to whatever remedies or damages Landlord may be entitled to by reason of a breach of the provisions of this Section 12.2. Landlord shall be entitled to injunctive relief and damages for injury to its reputation and for the diminution in the value of the Building. Tenant shall promptly and fully comply with all Governmental Regulations, prohibiting discrimination or segregation by reason of race, color, religion, disability, sex, sexual orientation, national origin or otherwise.

Landlord shall use commercially reasonable efforts to cause the other tenants of the Building not to engage in any; of the uses prohibited under this Section 12.2: provided, however, Tenant acknowledges that other tenants of the Building have or will be given the right to engage in certain uses that are prohibited hereunder and that the engaging in such uses by such tenants shall not be a default hereunder so long as such uses are consistent with the then character of the Building.

In addition, the Demised Premises shall not be used for any purpose that conflicts with the uses exclusively engaged in by other tenants of the Building that (except as provided below) exist as of tills date and that are set forth on Exhibit J. Landlord acknowledges that Tenant's proposed use as a sit in and carry out Restaurant does not violate any existing exclusives and is not prohibited in any other way at the Building.

**12.3 Operation of Business.** Tenant shall (i) utilize one hundred percent (100%) of the Demised Premises for the Permitted Use at all times during the Lease Term; (ii) operate the standard operating hours for sit in and carry out Restaurant in Chicago, IL (the "Business Hours"), unless prevented from doing so because of an event of a casualty or Force. Majeure; (iii) install and maintain, at all times in the Demised Premises fixtures, furnishings, fittings and equipment of the highest quality consistent with a first-class retail establishment; and (iv) install and maintain, at all times, a display of merchandise in any display windows customary for a first-class retail establishment, and shall keep the same well lit only at night, beginning at dusk and continuing only through the hours that Tenant is operating for business in the Demised Premises. Tenant shall also maintain, at all times, a full staff of trained employees; and Tenant's business shall be operated on a year round basis. Tenant shall warehouse, store and/or stock in the Demised Premises only such goods, wares and merchandise which Tenant currently offers for sale. Tenant shall limit the space used in the Demised Premises for office, clerical or other non-selling purposes, to that which is reasonably necessary for the operation of Tenant's business in the Demised Premises. Tenant will not permit any deliveries of goods or merchandise at any time when Tenant's employees are not available to receive them. Tenant will not permit any goods or merchandise to remain in, on or near any doorways, loading docks, receiving areas or other portions of the Demised Premises; any goods or merchandise remaining in such areas shall be reasonably deemed to be trash and may be disposed of by Landlord in such manner as Landlord may deem advisable and without liability, to Tenant. " To the extent Tenant operates at the Demised Premises (whether approved or not approved by Landlord) outside of the hours of 7:00 AM and midnight, Tenant shall pay any additional costs incurred by Landlord in connection with Tenant's opening the Demised Premises for business during such additional hours (or if applicable, Tenant's proportionate

share [taking into account any additional costs incurred by Landlord in connection with other tenants if any, who are also open for business (of such costs) including, but not limited to, any additional amounts of security, janitorial, and other cleaning, trash removal and heating, ventilating and air conditioning cost, and charges for utilities furnished by Landlord on account of the additional hours during which the Demised Premises are open for business.

Because of the difficulty of determining Landlord's damages attributable to Tenant's breach of the requirements of this Section 12.3. including the loss of anticipated percentage rent from other tenants of the Building, reduction in the value of the Building as a result of diminished salability, mortgage ability, adverse publicity or appearance, should Tenant (i) fail to take possession and open for business in the Demised Premises fully fixtured, stocked and staffed on the Rent Commencement Date, or (ii) abandon, leave vacant or desert the Demised Premises, (iii) fails to remain open for business during normal Building Hours, (iv) cease operating or conducting Tenant's business in accordance with the terms of this Section 12.3. or (v) otherwise fail or refuse to comply with any provision of this Section 12.3. then and in such event (hereinafter collectively referred to as "failure to do business'"). Landlord shall have the right, in addition to any arid all other rights or remedies Landlord may have under this Lease or at law or in equity, at Landlord's option (a) to collect an amount equal to one hundred percent (100%) of the Minimum Rent reserved for the period of Tenant's failure to do business, in addition to the other Rent (including Minimum Rent) already reserved herein, which amount shall constitute liquidated damages and shall be deemed Additional Rent and/or (b) to mandatory injunctive relief.

**12.4 Food Service Operation**. Without limiting Tenant's other obligations under this Lease, Tenant shall, at its cost and expense: (i) cause extermination services (including treatment for insects, spiders, rats, mice, moles and other rodents) to be provided to the Demised Premises by a reputable exterminator on a monthly basis throughout the Lease Term, or more often as Landlord may in Landlord's reasonable discretion require; (ii) during the Lease Term, maintain and repair the necessary piping, connections, catch basins and other facilities for the removal of all waste liquids from the Demised Premises in compliance with all applicable codes and ordinances of the City of Chicago and other governmental authorities having jurisdiction, and as is necessary to prevent the backing-up or discharge of any such waste liquids into the Demised Premises or into the Building; (iii) not dispose of waste, grease, oil or other materials which tend to cause clogging or blockage of pipes and drains (hereinafter, collectively referred to as "grease[11]") by pouring or permitting the same to flow into any drains or pipes. In die event that Tenant shall do so, Tenant shall reimburse Landlord for the entire cost of cleaning of all drains, pipes, sewers or other waste liquid disposal facilities damaged thereby. For this purpose, **"cleaning"** shall be deemed to include the replacement of all or any portion of the waste liquid disposal facilities necessitated by Tenant's improper disposal of grease; (iv) regularly and adequately clean or provide for tile cleaning of all grease traps, catch basins, plumbing waste lines and similar facilities serving the Demised Premises, not use any chemicals or other cleaning methods which could damage the drain pipes or other portions of the drainage and/or sewer system in or serving the Demised Premises or the Building and provide to Landlord, upon demand, reasonable proof that Tenant is regularly performing such cleaning or ..causing it to be performed; (v) if any leaking or spilling shall occur or if any goods and merchandise shall fall out of any containers or packages, Tenant shall be responsible for and shall immediately cause the same to be cleaned and removed and restore any damage to the Common Areas that may result; (vi) immediately ^transfer ail goods and merchandise received to the Demised Premises and

properly store the same in the Demised Premises so as to retard any spoilage thereof, to prevent any odors emanating therefrom and to prevent the infestation thereof; and (vii) store all garbage, trash and other



waste within the Demised Premises in leak, odor and vermin proof containers, such containers to be kept in temperature controlled areas of the Demised Premises not visible to members of the public.

## Section XIII
## Signs

Prior to the Rent Commencement Date, Tenant shall install, as a part of Tenant's Work and in accordance with Tenant's Plans (as approved by Landlord), signage depicted on Exhibit E attached hereto and made a part hereof. It is expressly understood and agreed that as an inducement for Tenant to enter into this Lease, Landlord acknowledges and agrees that it hereby consents to the signage included as Tenant's Work as seen on Exhibit E. Such signage shall be subject to compliance with all applicable Governmental. No alterations or changes shall be made to signage (other than repair of any damage) without Landlord's prior written consent, which may be withheld in Landlord's sole discretion. In addition, no additional signage, placards, canopies, awnings, banners, notices,, pictures or advertisements (collectively, "Signs") shall be placed by Tenant without Landlord's prior written consent (which consent may be withheld in Landlord's sole discretion): (i) temporarily or permanently oil the Building, or on the exterior of the Demised Premises or (ii) permanently in the interior of the Demised Premises, if any such Sign is either directly and immediately visible from outside the Demised Premises or is electrified. Tenant may place Signs which are not visible from the outside of the Demised Premises, provided they otherwise meet the qualifications of this Section. All Signs are to be of a standard consistent with those of a first-class retail center and with the standards of decency and morality of the community in which the Building is located and shall be professionally prepared and comply with all applicable Governmental Regulations, Rules and Regulations. Tenant shall maintain all Signs in good condition and repair and remove the same at the end of the Lease Term and repair any damage caused by such removal.

## Section XIV
## Defaults and Remedies

**14.1 Events of Default**. Each of the following shall constitute an event of default (an "Event of Default") hereunder: if Tenant fails to pay Rent on the date due and such failure continues for a period of five (5) business days after written notice from Landlord that the same has not been paid, provided, however, Landlord shall only be required to give written notice three times per calendar year or two consecutive months. After the Third time in any calendar year that Tenant fails to pay Rent on the date due an Event of Default shall occur if the failure continues for a period of five (5) days after the date due or

   **(A)**   if Tenant fails to maintain the insurance required to be maintained by Tenant hereunder and fails to correct such failure to maintain within the time period set forth in Section 4.3 hereof; or

   **(B)**   Tenant abandons or vacates all or a material portion of the Demised Premises; or

   **(C)**   if Tenant shall fail to comply with the terms of Section 12.3 hereof, and such failure continues for thirty (30) days after Landlord has provided written notice to Tenant of such default; or

   **(D)**   One of the following credit defaults occurs:

(1)    Tenant or any guarantor of this Lease commences any proceeding under any law relating to bankruptcy, insolvency, reorganization or relief of debts, or seeks appointment of a receiver, trustee, custodian or other similar official for Tenant or any guarantor of this Lease or for any. Substantial part of its respective property, or any such proceeding is commenced against. Tenant or any guarantor of this Lease and either remains undismissed for a period of thirty (30) days or results in the entry of an order for relief against Tenant or any guarantor of this Lease which is not fully stayed within seven (7) days after entry; or

(2)    Tenant or any guarantor of this Lease becomes insolvent or bankrupt, does not generally pay its respective debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or

(3). Any third party obtains a levy or attachment under process of law against Tenant's leasehold interest or other property or assets or any property or assets of any guarantor; or

(E)    If Tenant shall be in .default under any other provision of this Lease (other than those specified above) and shall remain so for a period of thirty (30) days after Landlord has provided written; notice to Tenant of such default, provided that if any such default cannot reasonably be remedied by Tenant within thirty (30) days after written notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default, provided that during such time Tenant is continuously and diligently pursuing the remedy necessary to cure .such default.

**14.2  Landlord's Remedies.** Upon the occurrence of an Event of Default, Landlord may, either:

(A)Terminate this Lease and Tenant shall pay to Landlord, upon demand, an accelerated lump sum amount equal to the amount by which Landlord's estimate of the aggregate amount of Rent owing from the date of such termination through the scheduled expiration date of the Lease Term,-plus Landlord's estimate of the aggregate expenses of reletting the Demised Premises (which expenses shall include, without limitation, brokerage fees, leasing commissions and tenant concessions incurred or estimated to be incurred by Landlord and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling or otherwise putting the Demised Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs [collectively, "Reletting Costs"]),.exceeds Landlord's estimate of the fair rental value of the Demised Premises for the same period (after giving effect to the time needed to relet the Demised Premises) both discounted to present value at the rate at which U.S. Treasuries are then yielding for a term closest to the scheduled expiration date of the Lease Term; or

(B)Terminate Tenant's right of possession of the Demised Premises without termination of this Lease, re-enter the Demised Premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, using the level of effort mandated by the laws of the State or Commonwealth where the Demised Premises are located to relet the Demised Premises at market rent and receive the rent therefrom; provided, however, Tenant shall not be entitled to receive; any such rent and shall remain liable for the equivalent of the amount of all Rent reserved herein less the avails of reletting, if any, after deducting there from the Reletting Costs. Any and sill monthly deficiencies so payable by Tenant pursuant to this clause shall be paid monthly on timely date herein provided for the payment of Minimum Rent and Additional Rent; or