**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 20 B 05012 |
| | ) | Chapter 11 |
| HITZ RESTAURANT GROUP | ) | Judge Donald R. Cassling |
| | ) | |
| Debtor. | ) | |

**MEMORANDUM OPINION**

Kass Management Services, Inc. ("Creditor") has presented two motions to the Court. The first seeks to enforce the obligation of Hitz Restaurant Group ("Debtor") to pay post-petition rent under 11 U.S.C. § 365(d)(3), and the second seeks to modify the automatic stay under § 362(d)(1). (Dkt. Nos. 21 & 29.) Specifically, Creditor requests that, if the Court does not grant its motion to modify the stay, the Court should order Debtor to immediately pay post-petition rent in the amount of $31,473.86 and to timely perform all future rent obligations. (Dkt. No. 21, p. 3.) Additionally, Creditor seeks an order requiring Debtor to vacate the premises immediately unless the post-petition rent is paid, and future obligations are kept current. (*Id.*)

Section 365(d)(3) requires a debtor-in-possession to "timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property until such lease is assumed or rejected, notwithstanding § 503(b)(1) of this title." 11 U.S.C. § 365(d)(3).

This section was added to the Bankruptcy Code in order to relieve landlords from the burden of proving that the rent payments they sought to collect from debtors prior to rejection were "actual and necessary" costs of preserving the bankruptcy estate. *See In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125, 1128 (7th Cir. 1998). The legislative history reflects congressional concern that lessors of nonresidential real property had frequently been forced to extend credit to an estate during the time given for assumption or rejection of the lease. *In re Telesphere Comm'ns, Inc.*, 148 B.R. 525, 529 (Bankr. N.D. Ill. 1992). Thus, payments required by § 365(d)(3) are not mere administrative expenses under § 503(b)(1). *Id.* at 530. "Section

365(d)(3) requiring 'timely performance' places payment of rent before the payment of administrative expenses. That is true even where the bankruptcy estate is administratively insolvent. Congress has spoken clearly." *In re C.Q., LLC*, 343 B.R. 915, 916 (Bankr. W.D. Wis. 2005).

Under § 365(d)(3), the first step in determining whether an obligation arises "from or after the order for relief" is to look at the terms of the lease. *See In re Consolidated Indus. Corp.*, 234 B.R. 84, 86-87 (Bankr. N.D. Ind. 1999). Under section 2.1 of the parties' lease agreement and its accompanying exhibit labelled "Minimum Base Rent Schedule," rent is due on the first of each month. (Dkt. No. 21, Ex. Part 1, p. 9, citing Dkt. No. 21, Ex. Part 2, p. 18.) Debtor filed its Chapter 11 petition on February 24, 2020. (Dkt. No. 1.) Thus, Debtor's contractual duty to pay February 2020 rent is a pre-petition obligation; its contractual duty to pay March 2020 rent is a post-petition obligation because it arose on March 1, 2020, after the order for relief. Accordingly, § 365(d)(3) would ordinarily require full payment of the March 2020 rent and all rental payments falling due thereafter. *See In re Ha-Lo Indus. Inc.*, 342 F.3d 794, 800-01 (7th Cir. 2003).

Debtor argues that its obligation to pay any post-petition rent is excused by the lease's force majeure clause and by Creditor's failure to make necessary repairs to the leased premises. (Dkt. No. 43.) The Court will first address Debtor's force majeure argument.

The lease's force majeure clause provides:

> Landlord and Tenant shall each be excused from performing its obligations or undertakings provided in this Lease, in the event, but only so long as the performance of any of its obligations are prevented or delayed, retarded or hindered by. . . laws, governmental action or inaction, orders of government. . . . Lack of money shall not be grounds for Force Majeure.

(Dkt. No. 21, Part 2, pp. 9 & 10.)

Debtor argues that this clause was triggered on March 16, 2020, the effective date of an executive order issued by Illinois Governor J. B. Pritzker addressing the Covid-19 pandemic in Illinois. Section 1 of that executive order pertains to restaurants:

2

> Beginning March 16, 2020 at 9 p.m. through March 30, 2020,[1] all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption. Such businesses are permitted and encouraged to serve food and beverages so that they may be consumed off-premises, as currently permitted by law, through means such as in-house delivery, third-party delivery, drive-through, and curbside pick-up. In addition, customers may enter the premises to purchase food or beverages for carry-out However, establishments offering food or beverages for carry-out, including food trucks, must ensure that they have an environment where patrons maintain adequate social distancing.

Ill. Exec. Order 2020-7 § 1.

Because the March lease payment became fully due and payable on March 1, 2020, and Governor Pritzker's executive order did not become effective until two weeks thereafter, the lease's force majeure clause does not excuse payment of the past-due March rent.  However, the Court concludes that the force majeure clause unambiguously applies, at least in part, to the rental payments which became due thereafter.

Force majeure clauses in contracts supersede the common law doctrine of impossibility. *See Commonwealth Edison Co. v. Allied-General Nuclear Servs.*, 731 F. Supp. 850, 855 (N.D. Ill. 1990).  Determining whether Governor Pritzker's executive order triggered the force majeure clause in the lease is a matter of contractual interpretation.  For that, the Court turns to Illinois state law.

 In Illinois, contracts are enforced according to their terms.  *See Consol. Coal Co. of St. Louis v. Schneider*, 163 Ill. 393, 401 (1896).  Under Illinois law, a force majeure clause will only excuse contractual performance if the triggering event cited by the nonperforming party was in fact the proximate cause of that party's nonperformance.  *Northern Ill. Gas Co. v. Energy Co-op., Inc.*, 461 N.E.2d 1049, 1058 (Ill. App. Ct. 1984).

---

[1] Gov. Pritzker twice extended the duration of this section: First, to April 30, 2020 via Ill. Exec. Order 2020-18 and then again to May 29, 2020 via Ill. Exec. Order 2020-33.

The force majeure clause in this lease was unambiguously triggered by § 1 of Governor Pritzker's executive order. First, his order unquestionably constitutes both "governmental action" and issuance of an "order" as contemplated by the language of the force majeure clause. Second, that order and its extensions unquestionably "hindered" Debtor's ability to perform by prohibiting Debtor from offering "on-premises" consumption of food and beverages. Finally, the order was unquestionably the proximate cause of Debtor's inability to pay rent, at least in part, because it prevented Debtor from operating normally and restricted its business to take-out, curbside pick-up, and delivery.

As discussed later in this opinion, it is significant to the analysis of Debtor's force majeure argument that Governor Pritzker's executive order did not prohibit all restaurant operations in Illinois. Indeed, his order not only permitted, but also encouraged, restaurants to continue to perform take-out, curbside pick-up, and delivery services. However, Creditor did not address that issue. Instead, it raised three arguments why the lease's force majeure clause had no effect at all on Debtor's obligation to pay post-petition rent under § 365(d)(3). Before turning to the issue of whether a force majeure clause can partially excuse performance, the Court addresses Creditor's three arguments that the force majeure clause does not apply to this situation at all.

Creditor first argues that the force majeure clause was not triggered because Governor Pritzker's executive order did not shut down the banking system or post offices in Illinois, and Debtor therefore would have physically been able to write and send rental checks to Creditor. (Dkt. No. 45, p. 3.) This is a specious argument that is unresponsive to Debtor's arguments and one that lacks any foundation in the actual language of the force majeure clause of the lease. The Court rejects it out of hand.

Second, Creditor characterizes Debtor's failure to perform as arising merely from a "lack of money," which it argues is not grounds for force majeure according to the lease's own terms. (*Id.*) But Debtor has not argued that lack of money is the proximate cause of its failure to pay rent.

4

Instead, it is arguing that Governor Pritzker's executive order shutting down all "on-premises" consumption of food and beverages in Illinois restaurants is the proximate cause of its inability to generate revenue and pay rent. The Court agrees, at least in part, and rejects Creditor's argument to the contrary.[2]

Creditor finally argues that Debtor could have obtained the money to pay the rent, despite the Governor's partial shutdown, by applying to receive a Small Business Administration loan. (*Id.* at p. 4.) Its failure to apply for such a loan prevents it from seeking to enforce the force majeure clause. (*Id.*) But Creditor has not cited any language from the lease or any case-law authority to support this argument. Nor does it acknowledge or address the plain language of the force majeure clause in the lease. As previously discussed, that clause is triggered by "governmental action" and governmental "orders." Nothing in that clause requires the party adversely affected by governmental action or orders to borrow money to counteract their effects.

The Court therefore rejects Creditor's three arguments and concludes that the force majeure clause partially excuses Debtor's obligation to pay rent for April, May, and June 2020. Nevertheless, Debtor is not off the hook entirely. Governor Pritzker's executive order did not prohibit Debtor from performing carry-out, curbside pick-up, and delivery services. Instead, it encouraged Debtor and other Illinois restaurants to perform those services. It follows that, to the extent that Debtor could have continued to perform those services, its obligation to pay rent is not excused by the force majeure clause. The Court therefore holds that Debtor's obligation to pay rent is reduced in proportion to its reduced ability to generate revenue due to the executive order.

---

[2] To the extent that there is a conflict between the lease's general provision that "lack of money" does not trigger the force majeure clause, while the lease's more specific provision that a "governmental action" or "orders of government" does, the Court concludes that the "governmental action" or "orders of government" provision must prevail. In interpreting an Illinois contract, when there is a conflict between a clause of general application and a clause of specific application, the more specific clause prevails. "[T]he more specific provision of a contract governs where it arguably conflicts with a more general provision." *Aeroground, Inc. v. CenterPoint Props. Trust*, 738 F.3d 810, 816 (7th Cir. 2013) (citing *Grevas v. U.S. Fidelity and Guar. Co.*, 152 Ill.2d 407, 411 (1992)). In this case, a lessee's lack of money could arise from any number of events, including but not limited to the effect of governmental action or orders. By contrast, the Debtor's failure to pay post-petition rent is the direct and proximate result, at least in part, of Governor Pritzker's executive order.

Neither party offered much assistance to the Court in determining the amount of the rent reduction caused by the force majeure clause. Creditor did not address the issue at all, and Debtor offered only its estimation that 75 percent of the square footage of the restaurant, consisting of its dining room and bar, was rendered unusable by Governor Pritzker's executive order. Debtor concedes, however, that the remaining 25 percent of the restaurant's square footage, consisting of the restaurant's kitchen, could have been used for carry-out, curbside pick-up, and delivery purposes. (Dkt. No. 43, p. 5.) Although the Court has not yet conducted an evidentiary hearing to determine the final amount of rent due under the lease during the pendency of Governor Pritzker's executive order, the Court preliminarily interprets Debtor's estimation as an admission that it owes at least 25 percent of the rental payments for April, May, and June 2020. Monthly rental payments due thereafter are likely to increase as the government's shut-down restrictions are gradually lifted.³ Therefore, the Court concludes that Debtor still owes at least 25 percent of the rent amount to Creditor under § 365(d)(3), even after application of the force majeure clause.

---

³ On May 5, 2020, Governor Pritzker unveiled "Restore Illinois," a five-phase plan for "reopening" Illinois. (RESTORE ILLINOIS: A PUBLIC HEALTH APPROACH TO SAFELY REOPEN OUR STATE, May 5, 2020, .pdf available at http://www.coronavirus.illinois.gov.) The five-phase plan calls for incrementally relaxed restrictions by region (northeast, north-central, central, and southern Illinois) for commerce, healthcare, and social gatherings based on criteria that measures Covid-19's prevalence. Illinois is currently in phase three of five, which requires restaurants to observe the same restrictions as those in Executive Order 2020-7, except that Governor Pritzker amended phase 3 to allow restaurants to provide outdoor dine-in service. (*Restaurants Can Open With Outdoor Seating in Phase 3 of Illinois' Reopening: Pritzker*, NBC CHICAGO (May 20, 2020, updated at 10:32 PM), https://www.nbcchicago.com/news/local/restaurants-can-open-with-outdoor-seating-in-phase-3-of-illinois-reopening-pritzker/2275370/). Phase four permits restaurants to resume on-site service and consumption, both indoor and outdoor, but at limited capacity. Finally, phase five allows all restaurants to resume regular service with no restrictions.

However, Chicago Mayor Lori Lightfoot did not allow Chicago to join the rest of the Northeast region as it moved to phase 3 on May 29, 2020. (*Chicago Announces Guidelines for Businesses to Reopen in Phase* 3, NBC CHICAGO (May 26, 2020, updated at 5:09 PM), https://www.nbcchicago.com/news/local/chicago-announces-guidelines-for-businesses-to-reopen-in-phase-3/2278309/.) Mayor Lightfoot has set out her own timetable instead. (SARAH SCHULTE & MICHELLE GALLARDO, *Coronavirus Chicago: Mayor Lori Lightfoot Releases Phase 3 Reopening Guidelines for Specific Industries*, ABC 7 CHICAGO, (May 27, 2020, 5:39 PM), https://abc7chicago.com/business/lightfoot-releases-phase-3-reopening-guidelines-for-specific-industries/6214744/.) Chicago will enter Phase 3 of Mayor Lightfoot's reopening plan on Wednesday, June 3, 2020, which allows restaurants to have outdoor dining, but with limited capacity. (*Chicago Will Enter Phase 3 of Reopening Wednesday As Planned, Lightfoot Says*, NBC CHICAGO (June 2, 2020, updated at 11:34 AM, https://www.nbcchicago.com/news/local/chicago-will-enter-phase-3-of-reopening-as-planned-lightfoot-says/2282601/.)

The Court next addresses Debtor's argument that it is excused from paying rent due to Creditor's alleged failure to make necessary repairs to the restaurant's HVAC system. The Court rejects that argument because it is one that should be raised in state court, not here. In this Circuit, lift-stay motions are intended to be summary proceedings, not full-fledged trials to determine non-core issues of state law. *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990) ("Many cases hold that the issues considered at a § 362 hearing are limited strictly to adequacy of protection, equity, and necessity to an effective reorganization." (citations omitted)). The legislative history supports this conclusion:

> At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be.

*Id.* (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977), U.S. Code Cong. & Admin. News, 1978, pp. 5787, 6300).

But what is appropriate for the Court to address is the question of whether Debtor has adequately protected Creditor's interests. In line with the Court's previous conclusions, it follows that Debtor so far has failed to do so because it has failed to pay any post-petition rent at all. However, because this opinion offers the parties their first look at the Court's analysis of Debtor's post-petition rental obligations, the Court will give Debtor a limited amount of time to make those payments.

Specifically, the Court sets a deadline of June 16, 2020, for Debtor to pay the full rent amount for March 2020. Under the terms of the lease, the rental payment due for March is $10,561.25, plus common area maintenance fees and real estate taxes for March 2020. (Dkt. No. 21, Part 2, p. 18.) By the same deadline, Debtor must pay $2,640.31 per month (25 percent of the base rent Debtor currently owes each month) for the months of April, May, and June 2020, plus 25 percent of both the common area maintenance fees and real estate taxes for those months. (*Id.*)

7

The total amount Debtor must therefore pay by June 16, 2020, is $18,482.18, plus the full common area maintenance fees and real estate taxes for March 2020 and 25 percent of its share of both the common area maintenance fees and real estate taxes for April, May, and June 2020. Failure to pay this amount by June 16, 2020, will result in entry of an order by this Court holding that Creditor has "cause" under § 362(d)(1) to lift the automatic stay because of Debtor's failure to adequately protect Creditor's interest in the leasehold. A status hearing on this matter will be held on June 23, 2020, at 10 a.m.

**ENTERED:**

DATE: June 2, 2020

*Donald R. Cassling*

**Donald R. Cassling**
**United States Bankruptcy Judge**